JOHNSON PRESS OF AMERICA, INC., Plaintiff-Appellant, v. NORTHERN INSURANCE COMPANY OF NEW YORK, Defendant-Appellee.

First District (5th Division)   No. 1—02—1540

Opinion filed June 13, 2003.

REID, J., concurring in part and dissenting in part.

Patrick Mazza & Associates, of Carol Stream (Patrick Mazza, of counsel), and Lehrer, Flaherty & Canavan, P.C., of Wheaton (Sharmila Roy, of counsel), for appellant.

Meckler, Bulger & Tilson, of Chicago (Steven D. Pearson and Steven J. Ciszewski, of counsel), for appellee.

JUSTICE QUINN delivered the opinion of the court:

Following a hearing, the trial court granted a motion for summary judgment in favor of Northern Insurance Company of New York finding that the collapse of the roof of Johnson Press of America, Inc.'s warehouse was not covered by the insured's insurance policy. This appeal followed.

On appeal, Johnson Press of America, Inc., argues that: (1) the trial court erred in granting the summary judgment motion in favor of the defendant; (2) the trial court should have construed an ambiguous insurance policy provision against the drafter and found for the insured; and (3) the trial court erred in finding that defendant did not violate the "bad faith" clause in section 155 of the Illinois Insurance Code. 215 ILCS 5/155 (West 1998). For the following reasons, we affirm the trial court's summary judgment order.

## BACKGROUND

Johnson Press of America, Inc. (plaintiff), purchased a property insurance policy (policy) from Northern Insurance Company of New York (defendant), providing insurance coverage for two business locations. This policy covered the period from June 5, 1997, to June 5, 1998. The policy covered one location at 800 North Court Street and another location at 1305-09 North Main Street in Pontiac, Illinois. The Court Street facility was where plaintiff conducted its day-to-day printing operation and was insured for $2,500,000. The Main Street location was used as a warehouse and was insured for $170,000.

The Main Street location consisted of two warehouses adjacent to each other. One building was a one-floor prefabricated steel warehouse built during the 1950s. Adjacent to the steel warehouse was a two-story brick building built during the early 1900s. The two buildings shared a common masonry wall, which had been part of the older brick building. This brick building had been vacant and was not part of plaintiff's daily business operation.

On June 1, 1998, at around 5:30 p.m., without any interference from natural forces, portions of the roof, the second floor, and the first floor of the old brick building collapsed into the basement. This collapse rendered the masonry walls unstable. Consequently, the City of Pontiac ordered that the warehouse be razed. On June 3, 1998, the plaintiff filed a claim for the damages caused by the roof's collapse.

On June 3, 1998, defendant retained an independent claims adjuster, L.W. Rogers & Company (Rogers), to review plaintiff's insurance claim. On the same day the assignment was received, Rogers sent its general adjustor, R.F. Ramsey (Ramsey), to view the damaged building. At the site, Ramsey was met by Glen Rustman (Rustman), an employee of the plaintiff. After surveying the site, Ramsey filed a report.

Separately, the defendant also retained Stuart K. Jacobson and Associates, Ltd. (Jacobson), an architectural and structural engineering firm, to assist in assessing plaintiff's insurance claim. On June 5, 1998, Jacobson sent James Senffner (Senffner) to inspect the collapsed building. After an on-site survey, Senffner filed a report.

Based upon Senffner's report, defendant denied plaintiff's insurance claim reasoning that the cause(s) of the roof's collapse fell under the exclusion clauses of the policy.

Plaintiff retained an engineering firm, Shefee Lulkin & Assoc., Inc., to review the Senffner report. Lulkin filed a report.

## THE INSURANCE POLICY

The insurance policy covered the building, fixtures, machinery,

equipment, and personal property against loss caused by certain accidental fortuitous events. Under the "Exclusions" section, it enumerated conditions that the insurer would not cover in the event the building collapsed. The "Exclusions," in pertinent part, read:

"EXCLUSIONS
***
We will not pay for loss or damage caused by or resulting from any of the following:
  a. ***
  b. ***
  c. ***
    (1) Wear and tear;
    (2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that caused it to damage or destroy itself.
***
  f. Continuous or repeated seepage or leakage of water that occurs over a period of 14 days.
***
    3. We will not pay for loss or damage caused by or resulting from any of the following ***
                        * * *
  c. Faulty, inadequate or defective:
                        * * *
Maintenance *** of part or all of any property on or off the described premises."

## EXPERT WITNESSES' TESTIMONY

### RAMSEY'S REPORT

On June 3, 1998, Ramsey, the general adjustor of Rogers, went to survey the collapsed building. Ramsey was accompanied by Rustman.

After the survey, Ramsey filed a report stating that the plaintiff was the owner of the collapsed building. It was a two-story brick building with a full basement built around 1900. There was a one-story steel building built around 1955 that was attached to the south wall of the collapsed building. The steel building was currently used as a warehouse.

Ramsey further reported that after Rustman left the scene, neighbors living near the collapsed building approached and told Ramsey that the roofing of the collapsed building had been blowing off the building for several years prior to its collapse. The neighbors also told Ramsey that the plaintiff had not been using the building for more than five years.

Ramsey wrote that there was no storm in the Pontiac area on the

date of the collapse. In his opinion, the collapse occurred as a result of long-term decay due to the plaintiff's failure to maintain the roofing of the building.

## JAMES SENFFNER'S REPORT

When Senffner arrived on the scene, he was also met by Rustman. Rustman told Senffner that the plaintiff only used the building's basement to store old equipment. The first and second floors were not used at all. The plaintiff used the adjacent steel building as a warehouse.

In a written report, Senffner wrote that a large portion of the roofing material was missing prior to the roof's collapse. As the roof collapsed, it caused a large portion of the first and the second floors to collapse into the basement. The wooden stairs leading to the first floor were deteriorated and collapsed. There were severe water stains and fungal growth on the second-floor framing. The brick mortar of the building was soft and deteriorated, and there was severe efflorescence (water damage) on the surface of the brick wall.

Senffner concluded that the building had severe wood decay. This decay was caused by water infiltration. The water infiltration resulted from the fact that a portion of the roof was missing. Since part of the roof was missing, it allowed water to enter the first- and second-floor stairwells to cause the wood decay. Because the stairwell of the building was in such poor shape, Senffner was unable to enter and examine the interior of the building.

Senffner also observed efflorescence present on the lower surface of the wall. This indicates that water was entering the wall from the top of the building and evaporating on the outside of the masonry wall. All these resulted from a leak in the roof. Senffner did not collect any debris to conduct tests.

## DEPOSITION OF JAMES SENFFNER

In a deposition, Senffner testified that he had examined 50 to 100 buildings within the last two years. Senffner did not examine the interior of the building in question because it was unstable and capable of further collapse. He opined that the building collapse was not caused by a freeze/thaw cycle, vandalism, or heavy snowfall from the last winter.

Further, Senffner observed fungal growth on more than 10 roof beams and joists. Fungal growth on the wood indicates that the moisture content is above 20%. Senffner further testified that there was also efflorescence on the walls of the building. Efflorescence will develop when water migrates through the masonry wall and evaporates on the surface of the wall. It usually takes three months for efflorescence to develop on a wall. Senffner also testified that there was

no evidence of termite infestation. Based on his observations of the structure's general condition, Senffner concluded that the deterioration was due to water infiltrations that ultimately led to the collapse of the roof.

## SHEFEE LULKIN'S REPORT

Plaintiff retained Shefee Lulkin & Assoc., Inc. (Lulkin), to review Senffner's report. In the report, Lulkin stated that Senffner did not pinpoint the cause of the initial failure that led to the roof collapse. Lulkin criticized the methodology that Senffner used in conducting his survey. Lulkin believed that Senffner should have collected debris and conducted tests to ascertain what caused the initial collapse.

## DEPOSITION OF SHEFEE LULKIN

In a deposition, Lulkin testified that he had never visited the site of the collapsed building nor did he see the pictures that Senffner took of the building. Lulkin testified that he had no reason to doubt that a large portion of the roof material was missing prior to the roof's collapse. He had no evidence that the impact of a falling load caused the collapse of the warehouse. Lulkin also had no reason to doubt that there was an area in the basement with water dripping. Lulkin further testified that it would take several seasons for fungal growth to develop on the wood. Lulkin testified that "whatever member [support beams or columns] failed first, was due to long-term deterioration and water infiltration."

## OTHER EVIDENCE

## LETTERS FROM THE CITY OF PONTIAC
## BUILDING SAFETY SERVICES

On November 18, 1996, the City of Pontiac's building safety services wrote to the plaintiff stating that its warehouse had "loose material on the roof." Since the building was located in an area with a large amount of residential traffic, this posed a safety hazard. The agency directed plaintiff to respond within five days to resolve the matter.

About 11 months later, on October 1, 1997, the City of Pontiac's building safety services again wrote to plaintiff stating that even though the plaintiff had contacted the building safety services and promised to remedy the roof problem, nothing had been done to correct the problem. In this second letter, the building safety services wrote "[w]ith recent winds, this office has received several complaints of the same nature regarding your building. Some of the roofing material is extremely large and has littered the neighbors' yards. You have ten days from receipt of this letter to contact this office and set a timetable for alleviation of this violation."

## CITIZEN'S COMPLAINT

Jan Kennedy, a neighbor who lived near the collapsed building, had lodged six complaints with the City of Pontiac's building safety services complaining that roofing material from the plaintiff's building had blown off and landed in her yard.

## DEPOSITION OF GLEN RUSTMAN

Rustman testified that he first worked for Johnson Press from 1959 to 1995, then he went to work for Johnson Press of America. He testified that the insured building consisted of two structures. One structure was a metal building built around 1955. The other structure was the razed building. It was a two-story brick building built around 1900. The plaintiff used the basement of the collapsed building as a storage area. Rustman further testified that he was responsible for the maintenance for the brick building. However, no record of the building's maintenance was kept. Rustman further testified that even though he was responsible for maintaining the building, he did not go inside the building to physically examine the premises. Instead, he would do a "drive by," checking on the structure. If a window was broken, he would replace it. Rustman testified that there was some maintenance work done on the roof prior to January 1995. A roofing company was contracted to patch the leaky areas on the roof. Rustman testified that he did not go up to the roof of the building from 1995 to 1998. Rustman also remembered that there were neighbors' complaints about roofing materials that had blown into the neighbors' yards.

## LETTER FROM INSURANCE COMPANY

When the plaintiff purchased the insurance policy in 1996, the defendant sent an insurance representative, Sonia Snyder (Snyder), to visit the buildings covered by the policy. After the visit, Snyder sent a letter reminding the plaintiff that the automatic sprinklers should be tested on a quarterly basis and that the holes in the wall connecting the sprinkled and the unsprinkled areas should be filled with noncombustible material. The letter addressed the conditions of the building located on 1503 North Main Street. This letter was obviously referring to the steel building.

## TRIAL COURT'S RULING

After reviewing the cross-motions for summary judgment and supporting material, the trial court ruled that the insurance policy was an all-risk policy. Based on the reports and testimony of the experts retained by the litigants, the roof's collapse was caused by long-term deterioration and water infiltration. Since there was no genuine issue

of material fact, the trial court denied the plaintiff's motion for summary judgment and granted the defendant's motion for summary judgment.

## ANALYSIS

■ The standard of review for a trial court's decision on a motion for summary judgment is de novo. See Doe v. Goff, 306 Ill. App. 3d 1131, 1134 (1999).

## SUMMARY JUDGMENT

■ Summary judgment is proper if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2000). The purpose of summary judgment is not to try a question of fact, but simply to determine whether a genuine issue of triable fact exists. Watkins v. Schmitt, 172 Ill. 2d 193, 203 (1996). It is well established that in determining whether a genuine issue of material fact exists, a court must construe the pleadings, depositions, admissions and affidavits strictly against the movant and liberally in favor of the opponent. Schmitt, 172 Ill. 2d at 203. In addition, any evidence that would be inadmissible at trial cannot be considered by the court in support of or in opposition to the motion for summary judgment. Schmitt, 172 Ill. 2d at 203-04.

■ In order to withstand a motion for summary judgment in a lawsuit involving an insurer's failure to pay a claim under an all-risk insurance policy, the insured bears the initial burden of presenting, through the papers on file, sufficient facts establishing a prima facie case. Wallis v. Country Mutual Insurance Co., 309 Ill. App. 3d 566, 570 (2000). This requires a showing that (1) a loss occurred, (2) the loss resulted from a fortuitous event, and (3) an all-risk policy covering the property was in effect at the time of the loss. Wallis, 309 Ill. App. 3d at 570.

Once an insured establishes a prima facie case, the burden then shifts to the insurer to show that the loss resulted from a peril expressly excluded from coverage. Wallis, 309 Ill. App. 3d at 570. See also International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co. of Illinois, 209 Ill. App. 3d 144, 148 (1990).

■ In Illinois, it is the insurer's burden to affirmatively demonstrate the applicability of an exclusion. Board of Education of Maine Township High School District No. 207 v. International Insurance Co., 292 Ill. App. 3d 14, 18 (1997). Furthermore, Illinois courts will liberally construe any doubts as to coverage in favor of the insured, especially when the insurer seeks to avoid coverage based on an exclu-

sion to the policy. *Yamada Corp. v. Yasuda Fire & Marine Insurance Co.*, 305 Ill. App. 3d 362, 371 (1999). If the insurer meets this burden through the presentation of undisputed facts, summary judgment is appropriate.

In this case, there is no dispute that the plaintiff's warehouse roof collapsed. There is also no dispute that the policy was in effect at the time the collapse occurred. Consequently, in order to prevail, the plaintiff needs to show that its loss resulted from a fortuitous event.

■ "Fortuitous" means happening by chance or accident, or occurring unexpectedly or without known cause. Black's Law Dictionary 664 (7th ed. 1999). The Restatement of Contracts defines a fortuitous event as an event that, as far as the parties are aware, is dependent on chance. Restatement of Contracts § 291, Comment *a* (1932); see *International Insurance*, 292 Ill. App. 3d at 18. The determination of whether a loss is fortuitous is a legal question for the court to determine. *Mattis v. State Farm Fire & Casualty Co.*, 118 Ill. App. 3d 612, 621 (1983). "[An] all-risk policy covers only those losses that were actually *risked* by the parties. [Citation.] A loss that was, so far as the parties knew, an inevitable certainty at the time of contracting is not fortuitous and will not be covered by the resulting contract." (Emphasis in original.) *Crete-Monee School District 201-U v. Indiana Insurance Co.*, No. 96C—0275, slip op. at ___ (N.D. Ill. 2000), citing *Mattis v. State Farm Fire & Casualty Co.*, 118 Ill. App. 3d 612, 621 (1983).

■ In this case, James Senffner reported that, prior to the collapse, portions of the roof and second and first floors were missing. The stairwell to the first and second floors was partially collapsed. He further observed that there was fungal growth on the beams. There were severe water stain marks on the roof beams and columns. There was water dripping in the basement and water damage on the walls of the building. Defendant's expert, R.F. Ramsey, also concluded that the collapse was the result of long-term decay due to plaintiff's failure to maintain the roofing of the building. Even plaintiff's expert, Shefee Lulkin, testified that the collapse was due to long-term deterioration and water infiltration. The dilapidated condition of the building demonstrates that the collapse of the building did not happen by chance or accident. It was expected. Since plaintiff failed to establish a *prima facie* case that the loss was due to a fortuitous event, the insurer is not liable.

Even assuming *arguendo* that plaintiff had established a *prima facie* case, plaintiff's loss resulted from a peril expressly excluded from the policy.

Under the exclusion clauses of the policy, the insurer would not

cover the collapse of the building if the collapse was due to (1) faulty, inadequate or defective maintenance; (2) decay, deterioration, or any quality in the property that caused it to damage or destroy itself; (3) wear and tear; and (4) continuous or repeated seepage or leakage of water that occurred over a period of 14 days.

In this case, Senffner's report stated that a large portion of the roof was missing prior to the building's collapse. Parts of the second and first floors were also missing before the roof collapsed. Senffner observed that there were severe water stain marks on the roof beams and columns. The stairwell to the first and second floors was deteriorated due to wood decay. There was water dripping in the basement area. There was also fungal growth on the beams. Senffner also observed that there was efflorescence on the walls of the building. This evidence pointed to the lack of maintenance of the building over a period of time, and the water seepage caused the wood to rot, which led to the collapse of the roof. The fungal growth on the wood indicated water had been leaking into the building for an extended period of time. Plaintiff's expert, Lulkin, testified that fungal growth would take several seasons to develop on the wood. This indicated that plaintiff had allowed water infiltration to occur for more than 14 days as specified under section 2(f) of the exclusion clause.

Other evidence also corroborated the lack of maintenance and water infiltration into the building. The City of Pontiac building safety services had written two letters dated October 11, 1996, and November 13, 1997, informing plaintiff that wind had blown off roofing which landed on the neighbors' yards.

In addition, Jan Kennedy, the neighbor living by the building, had lodged several complaints against plaintiff for the debris from the roof that was blown over onto her property.

Furthermore, the Ramsey report stated that on the date of the collapse, there was no storm in the Pontiac area to precipitate the collapse of the roof. The roof collapse was due to lack of maintenance and water seepage, which caused decay and weakened the wood structures. As such, the cause(s) of the roof's collapse fell squarely within the exclusion clauses of the policy. Thus, the trial court correctly granted summary judgment for the defendant.

On appeal, plaintiff argues that the defendant should honor the policy because it fully realized the conditions of this old building at the inception of the insurance policy. Plaintiff cites to Snyder's letter to support this argument.

A careful review of the record indicates that Snyder's letter addressed the testing of the sprinkler system and other concerns of the adjacent steel building. This is supported by Lulkin's report. In his

report, Lulkin stated "[w]hen the initial insurance policy was purchased the previous year, Northern Insurance of New York sent a representative to review the above referenced building and other properties to be insured. There were no comments about this building, though there were comments about the adjacent building." As such, plaintiff's argument is contradicted by the record.

On appeal, plaintiff argues that Senffner's report was inconclusive because he had failed to conduct any tests to establish the actual cause or to eliminate alternate causes of the collapse. Specifically, Senffner (1) could not determine which beam caused the initial failure; (2) failed to investigate and conduct tests on the debris from the collapsed warehouse; (3) did not check for termite infestation; (4) did not remember the number of the roof joists; and (5) did not know what the roofing material consisted of.

In this case, the issue is whether there existed a question of material fact that precluded the trial court from granting summary judgment to the defendant. Both parties asked for summary judgment, indicating that they both agreed there were no unresolved issues of material fact. The evidence in this case overwhelmingly shows that plaintiff failed to prove a *prima facie* case and the defendant did prove that the cause(s) of the roof collapse fell within the exclusion clauses.

## AMBIGUITY OF THE INSURANCE POLICY

■ On appeal, plaintiff presents a scenario that the roof collapse could have been caused by a hidden decay (a covered cause) and a lack of maintenance (an excluded cause). The policy did not clarify whether the insurer would provide coverage in such a situation. As such, plaintiff argues that the court should hold the ambiguity against the drafter and interpret the policy in favor of the insured.

"An argument not raised in the trial court and presented for the first time on appeal is waived, even in an appeal from a summary judgment." *Softa Group, Inc. v. Scarsdale Development*, 260 Ill. App. 3d 450, 452 (1993). Since this argument was not raised in the trial court, it is waived on appeal.

## SECTION 155 OF THE ILLINOIS INSURANCE CODE

■ On appeal, plaintiff argues that it took defendant 72 days to deny plaintiff's claim and this constitutes vexatious and unreasonable delay under section 155 of the Insurance Code. 215 ILCS 5/155 (West 1998).

As the question of whether an insurer's delay in granting or denying an insured's claim is vexatious and unreasonable is a factual one, it is a matter for the discretion of the trial court. Consequently, the trial court's decision will not be disturbed on review unless an abuse

of discretion is demonstrated in the record. *Dark v. United States Fidelity & Guaranty Co.*, 175 Ill. App. 3d 26, 30-31 (1988). An insurer's refusal to settle is not vexatious *per se. Deverman v. Country Mutual Insurance Co.*, 56 Ill. App. 3d 122, 124 (1977). It is well established that the length of time alone is not controlling in determining whether an insurer is guilty of vexatious delay in refusing to settle a claim. *Dark*, 175 Ill. App. 3d at 31. In deciding whether an insurer is liable for vexatious and unreasonable behavior, a trial court should consider the totality of the circumstances, including the insurer's attitude. *Buais v. Safeway Insurance Co.*, 275 Ill. App. 3d 587, 591 (1995).

Based on the record, defendant responded and examined the claim in an expeditious manner. Consequently, the trial court correctly held that defendant did not engage in vexatious and unreasonable behavior. Finally, we have held that the plaintiff's loss was not covered by the insurance policy. "[A] defendant cannot be liable for section 155 relief where no benefits are owed." *Martin v. Illinois Farmers Insurance*, 318 Ill. App. 3d 751, 764 (2000). Thus, the trial court did not abuse its discretion in ruling for the defendant.

As plaintiff's claims have no merit, the trial court's summary judgment order is affirmed.

Affirmed.

HARTIGAN, J., concurs.

JUSTICE REID, specially concurring in part and dissenting in part:

While I concur in the result, I must respectfully dissent with regard to that portion of the majority opinion of the court that holds that the plaintiff did not make out a *prima facie* case that the loss was due to a fortuitous event because it was "expected." The record does not support such a finding and the trial court did not so hold in its order that is appealed from. Therefore, there is no need for this court to only assume *arguendo* that plaintiff had established a *prima facie* case. That much is not in doubt. The burden clearly shifted to the insurance carrier to establish that the loss resulted from a peril expressly excluded from the policy.

There was no dispute as to the fact that the roof collapsed due to "continuous or repeated seepage or leakage of water that occurs over a period of 14 days" and "inadequate maintenance." These are exclusions within the policy. However, this is not the end of the coverage dispute in this case. I do not agree that the plaintiff has waived its argument with respect to the ambiguity of the policy. The burden had

876

shifted to the insurer to get out from under the coverage of this policy. If we were faced with the scenario that the roof collapse could have been caused by a hidden decay (a covered cause) and a lack of maintenance (an excluded cause), the plaintiff would be right that we would have to hold the ambiguity against the drafter and interpret the policy in favor of the insured. However, the insurer carried its burden based on what was before the trial court due to the fact that there is not one scintilla of evidence in this record of hidden decay as a cause of the roof collapse. It is for these reasons that I concur that the trial court's summary judgment order should be affirmed.