FIRST DIVISION

November 10, 2003

No. 1-01-1767

THORNWOOD, INC., THOMAS A. THORNTON, and THORNTON SOD NURSERY, INC.

Plaintiffs-Appellants,

v.

JENNER & BLOCK, an Illinois General Partnership; CARTER H. KLEIN, Individually; RANDOLPH M. PERKINS, Individually; and RICHARD L. VERKLER, Individually,

Defendants-Appellees.

)))

))))))))))))

Appeal from the Circuit Court of Cook County

01 L 1401

Honorable 

James F. Henry, 

Judge Presiding

JUSTICE McBRIDE delivered the modified opinion of the court upon denial of rehearing:

Plaintiffs-appellants (Thornton) appeal from the circuit court's dismissal of their verified complaint (complaint).  Thornton's three-count complaint accused defendants-appellees (Jenner & Block) of (i) aiding and abetting a breach of fiduciary duty; (ii) aiding and abetting a scheme to defraud; and (iii) aiding and abetting a scheme of fraudulent inducement.  Jenner & Block moved to dismiss the complaint, claiming that Thornton previously released his claims against Jenner & Block.  The circuit court agreed and dismissed the complaint.  Finding that Thornton has raised a material issue as to whether the release is valid, we reverse and remand.  

In February 1991, Thomas A. Thornton and James Follensbee (Follensbee), through James Follensbee & Associates and JF+A Properties, Ltd., formed the Thornwood Venture Limited Partnership (Partnership) for the purpose of developing Thornton's Kane County farm as a residential community and golf course (Thornwood Golf Course).  Thornton contributed 550 acres of land and an option to buy an additional 180 acres of land.  Thornton further agreed to fund the Partnership's endeavors until it was able to secure equity investors.  Follensbee contributed his expertise and experience as an architect, engineer, and real estate developer to the Partnership.  In exchange, Thornton received a 75% ownership interest in the Partnership.  Follensbee received a 25% ownership interest and the right to be compensated for his services as the Partnership's managing general partner.  

The Partnership consumed significant funds in its efforts to develop the Property.  By October 1994, Thornton had expended cash and incurred debt of more than $8 million for the Partnership.  Follensbee made numerous efforts to recruit investors for the Partnership.  In 1994, for instance, Follensbee approached PGA Tour Golf Course Properties, Inc. (PGA), and Potomac Sports Properties, Inc. (Potomac), regarding the possibility of developing Thornwood Golf Course as a PGA Tournament Players Course (TPC).  The benefits of such a partnership could have been substantial, including:

"(A) Golf tournament galleries of up to 75,000 people per day to visit the community during PGA Tour events;

(B) Immediate respect and credibility for the golf course by having the best players in the world compete on the course and publicly discuss its merits and playability;

(C) Unsurpassed recognition and overall community awareness from sports media and national television audiences;

(D) Ranking as a top residential community in annual revenues and total home sales;

(E) Highest average prices paid for any comparable golf area home sites;         

(F) Increased real estate sales traffic directly attributable to TPC/PGA Tour events;

(G) Diverse price ranges and products sold; and

(H) Realtor recommendations to prospects seeking golf-oriented residential communities."

Thus, the Partnership was likely to experience tremendous revenue growth if Thornwood Golf Course was a TPC.  Unfortunately, in a letter dated June 8, 1994, the PGA indicated that it would not be willing to work with the Partnership "unless the developer [was] willing to start over."  Follensbee delivered a copy of the letter to Thornton and told him that "the PGA and [Potomac's] involvement in the development project was not feasible."

Nevertheless, Follensbee continued to pursue partnership negotiations with the PGA and Potomac.  Without disclosing his continued negotiations, Follensbee began making plans with the PGA and Potomac regarding the layout of the golf course, the division of profits, and the duties of the Partnership, the PGA, and Potomac.  None of these plans involved Thornton; nor were they disclosed to Thornton.

In the midst of Follensbee's undisclosed efforts to recruit the PGA and Potomac as partners, Thornton confronted Follensbee regarding the significant expenditures he had made to fund Follensbee's development activities.  Thornton's assets were quickly dissipating into the Partnership without any indication that the Partnership was likely to have any success in the near future; thus, Thornton indicated to Follensbee that he desired to liquidate the Partnership or sell his interest. Follensbee responded that he would sue Thornton before he would allow liquidation of the Partnership.  Alternatively, he indicated that he would be interested in purchasing Thornton's interest in the Partnership.  At that time, Follensbee did not inform Thornton that his interest was likely to gain significant value in the near future because of the agreement Follensbee was negotiating with the PGA and Potomac.  Instead, Follensbee enlisted the services of Jenner & Block to assist him in acquiring Thornton's interest in the Partnership.  Jenner & Block also participated in Follensbee's negotiations with the PGA and Potomac.

On January 11, 1995, Follensbee and Thornton executed a settlement agreement (settlement agreement), which provided the requirements and terms for Follensbee to acquire Thornton's interest in the Partnership.  Alternatively, the settlement agreement provided for the liquidation of the Partnership.  Significantly, the settlement agreement contained mutual releases between the parties.  The release agreed to by Thornton (Follensbee Release) provides:

"Except as specifically provided in this Agreement or in any other agreement entered into after the date hereof, Thornton, jointly and severally, and the Partnership, jointly and severally, hereby unconditionally and irrevocably release [Follensbee] and the Partnership (and any Affiliates, directors, officers, employees, and agents of any of them) (collectively, the 'Released Parties') from any and all claims or rights either Thornton (or any of Thornton) or the Partnership may have against any one or more of the Released Parties arising under or in any manner related to the Partnership, the Partnership Agreement, the Contribution Agreement, the Property, breach of fiduciary duties, securities laws, or the solicitation and nondisclosure of discussions, offers, and opportunities regarding Financing Activities, any other document, instrument or agreement (whether oral or written) between any of Thornton or the Partnership and any of the Released Parties, or the operations, activities and business of the Partnership, including but not limited to any and all obligations for the repayment of any loans or advances or the payment of any interest thereon, the payment of any fees, the reimbursement of expenses, or any other such obligations of any kind or nature whatsoever."  

Additionally, Thornton contemporaneously executed a release (Jenner & Block Release) purporting to relieve Jenner & Block, Follensbee's attorneys:

"from any liability from any and all claims, counterclaims, controversies, actions, causes of actions, demands, debts, damages, costs, attorneys fees, or liabilities of any nature whatsoever in law of [
sic
] in equity, whether known or hereinafter discovered, that arose out of events that have occurred from the beginning of time until the date hereof." 

  

At the time Thornton signed the releases, he was not aware that Follensbee had continued negotiations with the PGA and Potomac and reached a conditional agreement for their involvement in Thornwood Golf Course.  Thornton did not become aware of Follensbee's actions until November 1998, almost four years after he signed the releases.  Nevertheless, Jenner & Block contends that these releases bar Thornton's claims.  The trial court agreed and dismissed the complaint.      

This court reviews the trial court's dismissal of the complaint 
de novo
, considering the allegations of the complaint in the light most favorable to Thornton.  See 
Board of Directors of Bloomfield Club Recreation Ass'n v. Hoffman Group, Inc.,
 186 Ill. 2d 419, 424 (1999). Our focus is not upon Thornton's ultimate chances of success on the merits, but whether the complaint is legally sufficient to allow Thornton to proceed with his claims against Jenner & Block.  Importantly, "[a] cause of action will not be dismissed on the pleadings unless it clearly appears that the plaintiff cannot prove any set of facts that will entitle it to relief."  
Hoffman Group
, 186 Ill. 2d at 424.  In this case, the primary issue is whether Thornton's claims were previously released, in which case, no set of facts would entitle Thornton to relief.  Accordingly, we analyze the releases.  

A release "is the abandonment of a claim to the person against whom the claim exists and is a contract to be construed under traditional contract law."  
Hurd v. Wildman, Harrold, Allen & Dixon
, 303 Ill. App. 3d 84, 88 (1999).  This means that "[w]here a written agreement is clear and explicit, a court must enforce the agreement as written.  Both the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids."  
Rakowski v. Lucente
, 104 Ill. 2d 317, 323 (1984). 

A release, however, will not "be construed to include claims not within the contemplation of the parties."  
Carlile v. Snap-On Tools
, 271 Ill. App. 3d 833, 838 (1995).  In many cases, a release makes clear on its face what claims were within the contemplation of the parties at the time the release was given.  In other instances, the release provides very general language that does not indicate with any clear definition what claims were within the contemplation of the parties.  In such cases, "the courts will restrict the release to the thing or things intended to be released and will refuse to interpret generalities so as to defeat a valid claim not then in the minds of the parties."  
Carlile
, 271 Ill. App. 3d at 839.  In other words, general releases do not serve to release unknown claims, which the party could not have contemplated releasing when it gave the release.  See 
Farm Credit Bank of St. Louis v. Whitlock
, 144 Ill. 2d 440, 448 (1991)("A general release is inapplicable to an unknown claim").  

In 
Myers v. Health Specialists, S.C.
, 225 Ill. App. 3d 68 (1992), for instance, the plaintiff sued his employer, seeking malpractice coverage for a claim brought years after his employment had terminated and after the alleged malpractice.  The defendant asserted that the plaintiff's claim was barred by a release signed seven years earlier by which the plaintiff released the defendant from: 

" 'all manner of actions, causes, and causes of actions, suits, debts, sums of money, accounts *** damages, judgments, executions, claims and demands, whatsoever, in law or in equity, *** which [plaintiff] now has against [defendant] or ever had, *** by reason of any matter, cause, or thing, whatsoever, on or at any time prior to the date of these Presents.' "  
Myers
, 225 Ill. App. 3d at 70.   

The court found that the release did not bar the plaintiff's claim for two reasons.  One was the breadth of the release, and the other was the release's time exemption.  
Myers
, 225 Ill. App. 3d at 75.  Specifically, the court found that "[t]he sweeping language of the release, *** renders it general" and prevents the release from barring the plaintiff's claim of which he was unaware when he executed the release.  
Myers
, 225 Ill. App. 3d at 75.

Similarly, the Jenner & Block Release contains sweeping language which makes it very general.  It purports to release all claims of any sort "that have occurred from the beginning of time until the date hereof."  As such, when the release is considered on its face, it cannot be construed to release the claims now made by Thornton because those claims were unknown to Thornton when he signed the release, and those claims could not have been in the contemplation of the parties when the release was signed.  Notably, the claims may have been contemplated by Jenner & Block, who crafted the release in an effort to protect itself from all potential claims.  But knowledge by one party, where the other party lacks knowledge, does not bring the claim within the "contemplation of the parties."  
Todd v. Mitchell
, 168 Ill. 199, 204 (1897)("[T]he breach of the covenant of warranty could not have been in contemplation of the parties, because unknown to the appellant at the time ***"). 

Importantly, however, the Jenner & Block Release was not executed in a vacuum.  It was executed contemporaneously with the settlement agreement.  And when more than one agreement is contemporaneously entered into, "they are considered one contract and the information needed to determine what 'claims, demands, and causes of action' were intended can be derived from the face of the [contemporaneously executed documents]."  
First National Bank of Geneva v. Lively
, 211 Ill. App. 3d 1, 5 (1991).  Therefore, the Settlement Agreement and the Follensbee Release contained therein may be considered in determining the intent of the parties in executing the Jenner & Block Release and may even compensate for the general nature of the Jenner & Block Release by providing guidance as to what claims were within the contemplation of the parties when the Jenner & Block Release was executed.  Because the Follensbee Release is considered separately below, we do not consider that release here, but the same reasoning applies to preclude dismissal.  
 

The Follensbee Release is less general than the Jenner & Block Release in numerous ways.  First, it limits the subject matter to which the release applies.  Specifically, only partnership-related claims are released.  Second, the Follensbee Release identifies several types of claims that are explicitly released.  These include claims arising under or related to the Partnership Agreement, claims related to the property, and claims related to breaches of fiduciary duties.  Certainly, Thornton's claims of aiding and abetting a breach of fiduciary duty, a scheme to defraud, and fraudulent inducement concern the Partnership and are based, in large part, on alleged breaches of fiduciary duty perpetrated by Follensbee with the assistance of Jenner & Block.  Thus, these claims are covered by the Follensbee Release because the claims contemplated by the parties included partnership-related claims.  Further,  because the Follensbee Release releases Follensbee 
and
 his agents, its terms release these contemplated claims against Jenner & Block.  

Additionally, as noted above, the terms of the Follensbee Release and the settlement agreement may be properly considered in interpreting the Jenner & Block Release.  The Follensbee Release releases partnership-related claims such as those now made.  Thus, the claims are barred 
if
 the releases are valid, because such partnership-related claims were within the contemplation of the parties at the time the releases were executed
.

When a defendant's motion to dismiss is based upon a release, which is valid on its face, as here, "then the burden shifts to the plaintiff to sufficiently allege and prove that a material issue of fact exists which would invalidate the agreement." 
 Meyer v. Murray
, 70 Ill. App. 3d 106, 114 (1979).  See also 
Hurd v. Wildman, Harrold, Allen & Dixon
, 303 Ill. App. 3d 84, 89 (1999); 
Dickman v. E.I. Du Pont de Nemours & Co.
, 278 Ill. App. 3d 776, 781 (1996); 
Roberts v. Dow Chemical Co.
, 244 Ill. App. 3d 253, 256 (1993).  Such facts include that "there has been fraud, duress, mutual mistake, or, at least in some cases, unconscionability."  
Carlile
, 271 Ill. App. 3d at 839.  Where such facts are alleged, an issue of material fact exists, which if proven, would likely defeat the affirmative defense of prior release.  See 
Carlile
, 271 Ill. App. 3d at 840-42.

In 
Phil Dressler & Associates, Inc. v. Old Oak Brook Investment Corp.
, 192 Ill. App. 3d 577, 579 (1989), for instance, the court reversed a grant of summary judgment where it found "a genuine issue existed as to a material fact, namely whether the release was procured by fraud."  In that case, the parties signed a release of claims arising in connection with a development agreement.  
Phil Dressler & Associates
, 192 Ill. App. 3d at 582.  The evidence surrounding the execution of the release, however, revealed that one of the parties to the release may have misstated material facts in order to induce the other plaintiff to sign the release.  
Phil Dressler & Associates
, 192 Ill. App. 3d at 583-84.  Thus, the court found that a material fact existed as to whether the release had been fraudulently induced and reversed summary judgment.  
Phil Dressler & Associates
, 192 Ill. App. 3d at 585-86. 

Similarly in 
Ainsworth Corp. v. Cenco,
 
Inc.
, 107 Ill. App. 3d 435 (1982), this court reversed a grant of summary judgment where it found a question of fact regarding fraudulent inducement.  
Ainsworth
 involved an asset purchase agreement for the purchase of the inventory and operating assets of a company engaged in the manufacture and sale of medical sutures and related hospital medical products (Asset Purchase Agreement) .  
Ainsworth
, 107 Ill. App. 3d at 436.  A warranty in the Asset Purchase Agreement provided:

" ' to the best of [Cenco's] knowledge none of the properties owned occupied or operated by [Cenco], nor the ownership, occupancy or operation thereof, is, to any extent materially and adversely affecting the business of [Cenco], in violation of any law, ordinance or regulation or *** federal, state and local safety laws, regulations and ordinances (including *** the United States Pure Food and Drug Act, or similar laws and regulations ***.)' "  
Ainsworth
, 107 Ill. App. 3d at 436.  

Subsequently, the parties had a dispute regarding the Asset Purchase Agreement.  In their resolution of that dispute, the parties entered into a settlement agreement, which provided, in part:

" '[T]he representations and warranties of [Cenco] in the [Asset Purchase] Agreement shall all expire on the date of [the settlement agreement] 
and Ainsworth and Cvengros waive any breach of any of such representations, warranties or covenants, or any default under the agreement which may have occurred prior to the date of this agreement
.' (Emphasis added.)" 
Ainsworth
, 107 Ill. App. 3d at 437.  

The United States Food and Drug Administration inspected the medical products facilities acquired through the Asset Purchase Agreement four months after the settlement agreement was executed.  That inspection revealed that the manufacturing processes used violated federal regulations.  
Ainsworth
, 107 Ill. App. 3d at 437.  Plaintiff filed suit against defendants alleging that they "had fraudulently induced it to purchase the medical products group by misrepresenting that it was being operated in accordance with government manufacturing and sterility procedures."  
Ainsworth
, 107 Ill. App. 3d at 438.  Defendants asserted the release as an affirmative defense.  
Ainsworth
, 107 Ill. App. 3d at 438.  The trial court granted summary judgment finding that "the terms of the settlement agreement between these parties [were] unambiguous and effectively barred the subsequent tort action, as a matter of law."  
Ainsworth
, 107 Ill. App. 3d at 439.  Significantly, in reversing on appeal, this court noted:

"A careful review of the record does not disclose an unequivocal denial by defendants that fraudulent representations were not in fact made to the plaintiff.  Instead, defendants persistently argue that the plain language of the settlement agreement waiving 'any breach of any such representations' wholly precludes any interpretation to the contrary."  
Ainsworth
, 107 Ill. App. 3d at 439.

In 
Phil Dressler & Associates
 and 
Ainsworth
, the alleged fraud concerned misrepresentations of fact. However, "[f]raud also may consist of the intentional omission or concealment of a material fact under circumstances creating an opportunity and duty to speak."  
H.K. Warner v. Lucas
, 185 Ill. App. 3d 351, 354 (1989).  "In order to prove fraud by the intentional concealment of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak."  
First Midwest Bank, N.A. v. Sparks
, 289 Ill. App. 3d 252, 260 (1997). Significantly, "in a confidential or fiduciary relationship, the dominant party's silence alone may constitute fraudulent concealment."  
Melko v. Dionisio
, 219 Ill. App. 3d 1048, 1061 (1991).  

Partners have a fiduciary relationship.  
Borys v. Rudd
, 207 Ill. App. 3d 610, 620 (1990).
 
 Consequently, they "owe one another a duty of full disclosure of material facts when making a settlement and obtaining a release."  
Golden v. McDermott, Will & Emery
, 299 Ill. App. 3d 982, 988 (1998).  Specifically, "the partner assuming control of the business is obliged to manage it in the interest of all the partners."  
Rizzo v. Rizzo
, 3 Ill. 2d 291, 302 (1954).  Accordingly, an agreement between partners is subject to close scrutiny,  
McCormick v. McCormick
, 118 Ill. App. 3d 455, 466 (1983)("A release between a trustee and a beneficiary, like all transactions growing out of a fiduciary relationship, is subject to the closest scrutiny"), and "no form of words, no matter how all encompassing, will foreclose scrutiny of a release [citation] or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties."  
Ainsworth
,
 
107 Ill. App. 3d at 439.    

"Factors significant in determining whether a particular transaction between parties standing in a fiduciary relation is fair include showing that the fiduciary has made a frank disclosure of all relevant information which he had, that the consideration was adequate, and that the other party had competent and independent advice before completing the transaction."  
Rizzo v. Rizzo
, 3 Ill. 2d at 305.  

Importantly with regard to releases between partners, this court has recognized:

"A release between fiduciaries is to be evaluated in the context of the fiduciary relationship. [Citation.] In appraising the validity of a release in the context of a fiduciary relationship, the court must regard the defendant as having the burden of showing by clear and convincing evidence that the transaction embodied in the release was just and equitable. [Citation.] In addition, the defendant must show by competent proof that a full and frank disclosure of all relevant information was made to the other party."  
Peskin v. Deutsch
, 134 Ill. App. 3d 48, 55 (1985).  

Thus, an agreement between partners is voidable if one partner withheld from the other facts that were material to the transaction.  
Golden
, 299 Ill. App. 3d at 990.       

In this case, Thornton has properly raised issues regarding the validity of the releases.  
Specifically, the allegations of the complaint indicate that the releases may have been obtained by fraud because Follensbee, a fiduciary to Thornton, failed to disclose his continued negotiations with the PGA and Potomac.  If in fact fraud is found, the releases may not bar Thornton's claims against Jenner & Block.
  This is true regardless of whether Jenner & Block had a fiduciary duty to Thornton with regard to the Partnership because Follensbee's actions could invalidate the 
entire
 settlement agreement and related releases.  See, 
e.g.
, 
Phil Dressler & Associates
, 192 Ill. App. 3d at 584("A release may be set aside if there is fraud in the inducement."); 
Ainsworth
, 107 Ill. App. 3d at 439 ("[F]raud in the inducement vitiates all contracts [citation] and renders [them] voidable at the option of the injured party").

While such a result might seem unfair to an innocent party who was released and had no knowledge of the underlying fraud that later invalidated the release, we are not faced with such a case here and our decision should not be construed to have decided such a case.  
Instead, Jenner & Block was involved in the drafting of the releases in question and, allegedly, in the acts underlying Follensbee's fraud.  The very insertion of the clause in the settlement agreement that purports to release certain fiduciary duties between Follensbee and Thornton from October 1, 1994, until the date the release was signed indicates an awareness that breaches of fiduciary duties may have occurred during that time. 
 See 
Bakalis v. Bressler
, 1 Ill. 2d 72, 81 (1953) quoting 
Selwyn & Co. v. Waller
, 212 N.Y. 507, 106 N.E. 321, 322 (1914)(" 'The very fact that one [partner] conceals his true interest from the other indicates a purpose to gain some advantage at the other's expense' ").  Because Follensbee and Thornton were partners, there was a duty to disclose these acts.  See 
Bakalis
, 1 Ill. 2d 72 (holding that one partner violated his fiduciary duty to another partner by failing to disclose his own negotiations for and actual purchase of the building in which the partnership leased property).  If the acts had been disclosed or were otherwise within Thornton's knowledge and Thornton had then agreed to the release, it would be binding.  If, however, those acts were concealed from Thornton in violation of Follensbee's fiduciary duties, the release may not prevent Thornton's claims.   See 
Peskin v. Deutsch
, 134 Ill. App. 3d 48, 55 (1985)(holding that a release between partners was not effective to bar the plaintiff partner's claim where there was "no evidence of a full and frank disclosure to plaintiff by defendant of the nature of the questioned payments either prior to or at the time of execution of the dissolution agreement").  Thornton has stated facts that support such a finding, and those facts have not been disproved or even denied by Jenner & Block.  Therefore, we reverse.  

We further find no merit to Jenner & Block's argument that Thornton ratified the settlement agreement, the Follensbee Release, and the Jenner & Block Release by accepting the benefits of these documents.  Based on the pleadings, there is still some question as to what, if anything, constitutes the benefit allegedly received and retained by Thornton under the settlement agreement.  Regardless, even if Thornton did receive and retain some benefit from the settlement agreement, we believe that Thornton timely sought to invalidate the settlement agreement and the related releases upon discovering the alleged fraud.  The same month that he discovered the alleged fraud, Thornton brought a claim against Follensbee seeking to rescind the settlement agreement.     

Jenner & Block urges that even if we find the releases do not bar Thornton's claims, we should affirm the dismissal of the complaint because it fails to state any claims upon which relief can be granted.  We disagree.  

In Illinois, a claim for aiding and abetting includes the following elements:

"(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." 
Wolf v. Liberis
, 153 Ill. App. 3d 488, 496 (1987)(recognizing the elements of claims for aiding and abetting and concert of action but failing to find liability where there were no allegations that the codefendant agreed to assist or substantially assisted in the commission of tort resulting in the plaintiff's injury).

Further, the Restatement (Second) of Torts controls recovery under the theory of concert of action in Illinois.  
Wolf
, 153 Ill. App. 3d at 496.  It provides:

"For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he 

(a) does a tortious act in concert with the other or pursuant to a common design with him, or 

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or 

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."  Restatement (Second) of Torts §876 (1979).

Although Illinois courts have never found an attorney liable for aiding and abetting his client in the commission of a tort, the courts have not prohibited such actions.  In 
Reuben H. Donnelley Corp. v. Brauer
, 275 Ill. App. 3d 300 (1995), for instance, the court considered a claim of aiding and abetting made against one defendant and his attorneys.  While not specifically considering whether the claim could be maintained against the attorneys as a matter of law, the court implicitly accepted that such a claim could be maintained when it held that there could be no liability because the underlying conduct involved a breach of contract, not a tort.  
Brauer
, 275 Ill. App. 3d at 310.  

Similarly, Illinois courts recognize that claims for conspiracy may be maintained against attorneys where there is evidence that the attorneys participated in a conspiracy with their clients.  See,
 e.g., Bosak v. McDonough
, 192 Ill. App. 3d 799, 804-05 (1989) (recognizing conspiracy claim against attorney but finding insufficient evidence to impose liability).  Accordingly, we see no reason to impose a 
per se 
bar that prevents imposing liability upon attorneys who knowingly and substantially assist their clients in causing another party's injury.  As we have recognized, " '[o]ne may not use his license to practice law as a shield to protect himself from the consequences of his participation in an unlawful or illegal conspiracy.' "  
Celano v. Frederick
, 54 Ill. App. 2d 393, 400 (1964), quoting 
Wahlgren v. Bausch & Lomb Optical Co.
, 68 F.2d 660, 664 (7th Cir. 1934).  The same policy should prevent an attorney from escaping liability for knowingly and substantially assisting a client in the commission of a tort.  

Certainly, as Jenner & Block points out, mere receipt of copies of letters authored by Follensbee, which expose his breach of fiduciary duty, probably does not constitute aiding and abetting under Illinois law.  Here, however, Thornton alleges more.  He alleges that Jenner & Block aided and abetted by knowingly and substantially assisting Follensbee in breaching his fiduciary duty by (1) communicating the competitive advantages available to the Partnership from the PGA/TPC plan to other parties, but specifically not to Thornton; (2) expressing Follensbee's interest in purchasing Thornton's interest in the Partnership and negotiating the purchase of that interest without disclosing to Thornton the continued negotiations with the PGA and Potomac; (3) reviewing and counseling Follensbee with regard to the production of investment offering memoranda, financial projections, and marketing literature, which purposely failed to identify Thornton as a partner; and (4) drafting, negotiating, reviewing, and executing documents, including the Jenner & Block and Follensbee Releases, relating to the purchase of Thornton's interest and the PGA/TPC Plan with knowledge that Thornton was not aware of the PGA/TPC plan.  All of these acts are alleged to have been perpetrated by Jenner & Block while it had knowledge that Thornton and Follensbee were partners, that Follensbee had a duty to disclose the PGA/TPC plan to Thornton, and that Follensbee did not disclose the PGA/TPC plan to Thornton despite having the opportunity and duty to do so.  Importantly, Thornton is not required to prove his allegations at this time.  Thus, even though Thornton may face an uphill battle in proving his claims, we cannot at this time affirm the dismissal of his complaint.         

In its petition for rehearing, Jenner & Block argues that we have disregarded its claim that the complaint was properly dismissed because it fails to adequately allege damages.  Jenner & Block, however, did not raise this argument in the trial court.  Accordingly, it is waived and we need not consider it.  See 
Haudrich v. Howmedica, Inc.
, 169 Ill. 2d 525, 536 (1996)("It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal"); 
Johnson Press of America, Inc. v Northern Insurance Company of New York
, 339 Ill. App. 3d 864, 874 (2003)("Since the argument was not raised in the trial court, it is waived on appeal"); 
American Country Insurance Company v. Williams
, 339 Ill. App. 3d 835, 846 (2003)("An argument not raised in the trial court is generally considered waived for purposes of appeal").  

Because we find that Thornton has raised a material issue as to whether the releases are valid, we reverse and remand this case to the circuit court for further proceedings consistent with this opinion.

     Reversed and remanded.

CAHILL and GARCIA, JJ., concur.