THIRD DIVISION
November 12, 2008

1-08-0085 & 1-08-0995 Cons.

| | | |
|---|---|---|
| CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County. |
| | ) | |
| AMERICAN HARDWARE MANUFACTURERS | ) | |
| ASSOCIATION, TIMOTHY FARRELL, WILLIAM | ) | |
| FARRELL, REED ELSEVIER, INC., FREEMAN | ) | |
| DECORATING COMPANY, and FREEMAN | ) | |
| DECORATING SERVICES, INC., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Federal Insurance Company, | ) | |
| | ) | Honorable |
| Defendant-Counterclaimant and Third-Party | ) | Leroy K. Martin, Jr., |
| Plaintiff-Appellee). | ) | Judge Presiding. |

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, Cincinnati Insurance Company (Cincinnati), sought an order from the circuit court of Cook County declaring that it was not obligated to defend its insureds, American Hardware Manufacturers Association (AHMA) and its executive officers, Timothy Farrell and William P. Farrell (collectively, the executives), in an underlying litigation involving competing national hardware trade shows (the underlying action). By agreement, AHMA and the executives assigned

their rights under the Cincinnati policies to defendant-counterclaimant, Federal Insurance Company (Federal). The circuit court denied Cincinnati's motion for summary judgment and granted summary judgment in favor of Federal, from which decision Cincinnati appeals.

On appeal, Cincinnati argues that the circuit court erred by: (1) finding that Federal has standing to pursue Cincinnati for defense fees based on the assignment agreement; and (2) granting Federal's summary judgment motion and denying Cincinnati's motion for summary judgment.

## I. BACKGROUND

This action arises from an insurance coverage dispute between Cincinnati and Federal regarding the allocation of the duty to defend and the sharing of costs associated with the defense of counterclaims from the underlying action. Cincinnati is an Illinois corporation with its principal place of business in Ohio. Federal is organized and exists pursuant to the laws of the state of Indiana with its principal place of business in the state of New Jersey. AHMA is a trade association serving the hardware, home improvement, lawn and garden, paint and decorating, and related industries. AHMA is a Delaware not-for-profit corporation with its principal place of business in Illinois.

Cincinnati issued two primary, "occurrence"-based insurance policies to AHMA, which provided coverage to AHMA and the executives for personal and advertising injury liability. Federal issued a "claims made," not-for-profit organization liability insurance policy affording coverage to AHMA and the executives.

In the underlying action in the United States District Court for the Northern District of Illinois, AHMA sought damages and other relief against Reed Elsevier, Inc. (Reed), Freeman Decorating Company and Freeman Decorating Services, Inc. (collectively, Freeman), stemming from

2

a dispute involving competing national hardware trade shows. Reed and Freeman asserted counterclaims against AHMA and the executives asserting, *inter alia*, defamation *per se*, libel *per se*, breach of contract, and statutory violations of the Uniform Deceptive Trade Practices Act (815 510/1 et seq. (West 2006)), the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act)(815 505/1 et seq., (West 2006)) and the Lanham Act 15 U.S.C. § 1051 et seq. (2006) (the counterclaims). Essentially, the counterclaims allege misconduct by AHMA and the executives for publishing and advertising material created by the AHMA in connection with its planned 2004 national hardware exhibition.

Cincinnati sought an order from the circuit court declaring it has no obligation to defend or indemnify AHMA and the executives for the counterclaims. Federal entered into an assignment agreement with AHMA and the executives to transfer to Federal all of their rights under the Cincinnati polices and claims against Cincinnati relating to payment or reimbursement of defense expenses incurred in defense of the counterclaims. The circuit court granted Federal's motion to add Federal as a party to Cincinnati's declaratory judgment action and substitute it for AHMA and the executives to the extent of the interests in the Cincinnati polices assigned to Federal. Federal and Cincinnati filed cross-motions for summary judgment to establish whether Cincinnati had a duty to defend AHMA and the executives on an equal basis with Federal with respect to the counterclaims. The circuit court granted summary judgment in favor of Federal and denied Cincinnati's summary judgment motion.

### A. The Insurance Policies

Cincinnati and Federal each issued separate types of insurance policies with differing policy

1-08-0085 and 1-08-0995 Consolidated

periods, which pertinent provisions provide as follows.

      1. The Cincinnati Insurance Policies Issued to AHMA

Cincinnati issued to AHMA policy number CPP 068 29 84 for the effective dates of September 30, 2000 to September 30, 2003. The portion of the policy pertaining to personal and advertising injury liability states:

"1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages. We may at our discretion investigate any 'occurrence' or offense and settle any claim or 'suit' that may result.

                * * *

    b. This insurance applies to:

      (1) 'Personal injury' caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

      (2) 'Advertising injury' caused by an offense committed in the course of advertising your goods, products or services * * *."

The 2000 to 2003 Cincinnati policy also included the following exclusions:

"2. Exclusions

    This insurance does not apply to:

4

a. 'Personal injury' or 'advertising injury':

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of a contract or agreement."

The 2000 to 2003 Cincinnati policy also includes a provision entitled, "Other Insurance," which provides as follows:

"4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below [triggered coverage of excess insurance] applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

* * *

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will

follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first."

The pertinent definitions contained within the 2000 to 2003 Cincinnati policy provide:

"1. 'Advertising injury' means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

* * *

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

Advertising means an advertisement, publicity article, broadcast or telecast.

* * *

12. 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

13. 'Personal injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses:

6

* * *

  d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services ***."

Cincinnati issued a renewal policy to AHMA under policy number CPP 068 29 84/CPA 068 29 84, for the effective dates of September 30, 2003, to September 30, 2006. Coverage for personal and advertising liability provides:

  "1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and the duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or 'suit' that may result.

  b. This insurance applies to 'personal and advertising injury' only if:

   (1) The 'personal and advertising injury' is caused by an offense arising out of your business; and

   (2) The 'personal and advertising injury' offense was

committed in the 'coverage territory' during the policy period ***."

The 2003 to 2006 Cincinnati policy's exclusions for personal and advertising injury are as follows:

"2. Exclusions

This insurance does not apply to:

a. Knowing Violation of Rights of Another

'Personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'

b. Material Published With Knowledge of Falsity

'Personal and advertising injury' arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

* * *

I. Infringement of Copyright, Patent, Trademark or Trade Secret

'Personal and advertising injury' arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your 'advertisement,' of copyright, trade dress or slogan."

8

The 2003 to 2006 Cincinnati policy's "Other Insurance" provision remained unchanged from the 2000 to 2003 policy. The 2003 to 2006 policy defines a pertinent number of terms as follows:

"1. 'Advertisement' means a notice that is broadcast, telecast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. 'Advertisement' includes a publicity article. For purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an 'advertisement.

\* \* \*

16. 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

17. 'Personal and advertising injury' means injury, including consequential 'bodily injury,' arising out of one or more of the following offenses:

\* \* \*

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

9

* * *

    f.  The use of another's advertising idea in your 'advertisement'; or

    g.  Infringing upon another's copyright, trade dress or slogan in your 'advertisement.'"

2. The Federal Insurance Policies Issued to AHMA

Federal issued a "Not For Profit Organization Liability Policy" to AHMA under policy number 6801-4601 for the effective dates of September 30, 2004, to September 30, 2005. The Federal policy insures that it "shall pay on behalf of an Insured all Loss which such Insured becomes legally obligated to pay on account of any Claim first made against such Insured during the Policy Period or, if exercised, during the Extended Reporting Period, for *** Personal Injury or Publishers Liability committed, attempted, or allegedly committed or attempted, by such Insured before or during the Policy Period." The Federal policy contains many of the same definitions included in the Cincinnati policies, but defines "Personal Injury or Publishers' Liability" as "a Wrongful Act constituting false arrest, wrongful detention or imprisonment, malicious prosecution, defamation, invasion of privacy, wrongful entry or eviction, infringement of copyright or trademark, unauthorized use of title, plagiarism, or misappropriation of ideas." Also similar to the Cincinnati policies, the Federal policy states that it "shall have the right and duty to defend any Claim covered by this policy," and that "[c]overage shall apply even if the allegations are groundless, false or fraudulent." In addition, the Federal policy contains an "Other Insurance" clause that provides:

"If Loss arising from a Claim made against any Insured is insured under any other valid policy, prior or current, then this policy shall cover such Loss, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such Loss is in excess of the amount of payment from such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this policy."

### B.  The Underlying Counterclaims

On January 31, 2005, Reed filed its initial counterclaim against AHMA and Timothy Farrell in the United States District Court for the Northern District of Illinois, alleging injury occurring between July 2003 and April 2004. Thereafter, on October 4, 2005, Reed filed an amended and supplemented counterclaim, while Freeman filed its own counterclaim against AHMA and the executives. The counterclaims alleged misconduct by AHMA and the executives in the form of misleading representations in various published materials and on the Internet in connection with AHMA's planned 2004 national hardware exhibition.

Reed's counterclaim alleged that it entered into a separation agreement with AHMA so that Reed could maintain ownership of the National Hardware Show for presentation in Las Vegas, Nevada, while AHMA could develop a new trade show in Chicago, Illinois. Reed alleged that, "in an attempt to save its show, and to hurt Reed's show, AHMA

embarked on a campaign to publicly impugn Reed's integrity in a desperate attempt to shift industry interest to AHMA's new trade show and away from the National Hardware Show."

Similarly, Freeman's counterclaim alleged that, "[i]n furtherance of this wrongful scheme [to hurt Reed's trade show and save its own show], AHMA filed a lawsuit against Reed. Although Freeman was not at that time a named party to the lawsuit, AHMA's original [complaint] accused Freeman of, inter alia, paying kickbacks to Reed, conspiring with Reed to defraud AHMA, and other unlawful conduct." Freeman also alleged that "AHMA, William Farrell and Timothy Farrell used the lawsuit as a pretext for wrongly publishing copies of the Complaint to third parties, and issuing press releases and other false and misleading statements designed to sully Reed and Freeman's reputations and make exhibitors and attendees unwilling to attend the National Hardware Show."

The counterclaims assert causes of action for defamation *per se* and libel *per se* against AHMA and the executives and solely against AHMA for violations of the Uniform Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act. The counterclaims also assert against AHMA violations of the Langham Act, including trademark infringement, false advertising, and unfair competition. in violation of the Langham Act. In addition, breach of contract, breach of release and covenant not to sue, and contractual indemnification are asserted against AHMA.

The defamation allegations were plead under the actual malice standard. The counterclaims alleged that, "[a]t the time these statements were made, Timothy Farrell and AHMA knew that these statements were false. Alternatively, at the time the statements were

made, Farrell and AHMA exhibited a reckless disregard for the falsity of these statements."

The counterclaims included a prayer for punitive damages against AHMA and the executives

"because of the willful and malicious nature in which the statements were made ***."

### C. The Defense of AHMA and the Executives

AHMA tendered the defense of Reed's initial counterclaim to Federal on or about

February 17, 2005. On June 29, 2005, Federal agreed to advance defense expenses to

AHMA and Timothy Farrell subject to a reservation of rights. AHMA and the executives

tendered the defense of Reed's amended and supplemented counterclaim and Freeman's

counterclaim on October 4, 2005. Federal agreed to advance defense expenses to AHMA

and the executives in connection with the counterclaims subject to a complete reservation

of rights on or about November 23, 2005.

AHMA and the executives also sought a defense for the counterclaims from

Cincinnati.[1] Cincinnati commenced its declaratory judgment action on May 25, 2005, prior

to its denial of coverage to AHMA and the executives by letter dated May 27, 2005.

### D. The Assignment Agreement

On May 17, 2006, Federal entered into an assignment agreement with AHMA and

the executives in which AHMA and the executives assigned to Federal "any and all rights,

claims or causes of action that AHMA and/or the Executives may have against Cincinnati,

---

[1] The record does not make clear when AHMA and the executives attempted to tender the defense of the counterclaims to Cincinnati.

13

however denominated, based on, arising out of, or relating to payment or reimbursement under the Cincinnati Policies of AHMA's and the Executives' Defense Expenses incurred in connection with the Counterclaims." Federal agreed to reimburse AHMA and the executives for expenses incurred by AHMA and the executives related to or arising out of their cooperation in the defense of the Cincinnati declaratory judgment action. Federal also agreed to pay AHMA's and the executives' past, present and future defense expenses related to the counterclaims subject to the reservation of rights letters sent to AHMA.[2] The assignment agreement also stated that "Federal shall defend, indemnify and hold harmless AHMA and the Executives in the Cincinnati Dec. Action and in any suit, claim, counterclaim or cross-claim by Cincinnati relating to or arising out of AHMA and the Executives' assignment to Federal of their rights, claims, causes of action under the Cincinnati Policies with respect to payment of Defense Expenses incurred by AHMA and the Executives in defense of the Counterclaims."

### E. Federal's Motion for Addition of Parties

On June 8, 2006, Federal filed a motion for addition of parties and leave to file a counterclaim and third-party complaint pursuant to sections 2-1008, 2-616 and 2-406(c) of

---

[2] Federal claims it has paid defense expenses totaling $5,632,999.62 in its response brief, but the record does not contain a current itemization of defense expenses matching that amount. Accordingly, the record does not make clear the amount of defense costs expended at the time this appeal was filed.

14

the Illinois Code of Civil Procedure (735 ILCS 5/2-1008, 2-616, 2-406(c) (West 2006)). Federal asserted that, as a result of the assignment agreement, it had succeeded to the rights of AHMA and the executives to receive reimbursement of their defense expenses from Cincinnati in connection with the counterclaims. Federal alleged that, in addition to its rights as the insureds' assignee, it had independent claims against Cincinnati based upon their respective policies' "other insurance" clauses for contribution for the defense expenses Federal advanced to AHMA and the executives for the underlying counterclaims. Federal claimed that Cincinnati has a defense obligation under its policies and that Federal is entitled to reimbursement for some or all of the defense expenses it has paid.

On July 21, 2006, Cincinnati filed a memorandum of law in opposition to Federal's motion for addition of parties. Cincinnati argued that the assignment agreement lacked consideration and, therefore, was void. Cincinnati also asserted that the assignment agreement was a partial assignment that is prohibited by Illinois law absent the obligor's consent. Cincinnati contended that the anti-assignment clause in its policies prohibits the assignment of rights and duties. In addition, Cincinnati argued that public policy precluded the assignment agreement.

On August 10, 2006, the circuit court granted Federal's motion and, thereafter, Federal was added as a third-party defendant.

F. Federal's Counterclaim and Third-Party Complaint

On August 14, 2006, Federal filed its counterclaim and third-party complaint against Cincinnati, in which it alleged causes of action for breach of duty to defend and equitable

15

contribution for allocation of defense expenses in connection with the counterclaims against AHMA and the executives. Federal sought a declaratory judgment that it is entitled to payment by Cincinnati of contribution of all or part of the defense expenses it advanced to AHMA and the executives.

### G. Cincinnati's Complaint for Declaratory Judgment

Cincinnati's initial complaint for declaratory judgment was filed after Reed's counterclaim was first filed, but before Reed filed its amended and supplemented counterclaim and Freeman filed its counterclaim. Cincinnati's May 25, 2005, complaint alleged that AHMA and the executives were not covered for the counterclaims under either Cincinnati policy.[3] Cincinnati filed an amended complaint for declaratory judgment on August 31, 2006, after Federal was added as a third-party defendant, which alleged the same as the initial complaint, asserting it has no duty to defend or indemnify AHMA and the executives.

### H. Cross-Motions for Summary Judgment on the Duty to Defend

On February 15, 2007, Federal moved for summary judgment regarding Cincinnati's duty to defend. Federal argued that summary judgment in its favor was warranted because the allegations asserted in the counterclaims fell within the potential coverage afforded by Cincinnati's policies. Federal contended that the statements underlying both of the counterclaim's defamation counts for commercial disparagement fell within the scope of

---

[3] Cincinnati also asserted it had no duty to defend or indemnify AHMA and the executives under an umbrella policy, which is not at issue in this case.

16

"[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services," covered by the 2003 to 2006 Cincinnati policy. Federal also asserted that, the numerous allegations by Reed that AHMA deceptively advertised its 2004 trade show by suggesting that it was the continuation of the trade show to which Reed claimed exclusive rights, separately implicated the covered offenses of "[m]isappropriation of advertising ideas or style of doing business" and "use of another's advertising idea in your 'advertisement'" under both Cincinnati policies. In addition, Federal asserted that, under Illinois law, the policies' personal and advertising injury offenses encompassed Reed's count for alleged trademark infringement.

Federal requested summary judgment to declare that (1) Cincinnati has a duty to defend AHMA and the executives in the counterclaims under both Cincinnati policies; (2) the "other insurance" provisions contained in their respective policies require Cincinnati to pay one-half of all defense expenses as they are incurred by AHMA and the executives in the underlying counterclaims; and (3) Federal is entitled to recover from Cincinnati one-half of the defense costs it has paid on behalf of Federal's and Cincinnati's mutual insureds.

Cincinnati filed its cross-motion for summary judgment on October 12, 2007. Cincinnati argued that it has no duty to defend the defamation counterclaims or the counts alleging violations of the Uniform Deceptive Trade Practices Act, the Illinois Consumer Fraud Act or the Langham Act because they do not allege any fortuitous loss. Cincinnati also asserted that it has no duty to defend the counterclaims for trademark infringement because there is no coverage under its policies. Further, Cincinnati contended it has no duty to defend

17

the breach of contract claims because those claims allege "economic loss," which is not covered in its policies. Finally, Cincinnati argued that, even if the circuit court were to find a duty to defend, Federal did not meet its burden of proof as to the defense costs it seeks to recover.

    I. <u>The Circuit Court's Ruling on the Cross-Motions for Summary Judgment</u>

On December 12, 2007, the circuit court conducted a hearing on the cross-motions for summary judgment. Federal argued that the personal and advertising injuries are claims based on negligence and that Illinois law provides insurance policies cannot have exclusions for intent to negate the duty to defend. Counsel for Federal asserted that an insurer cannot, on the one hand, grant coverage for intentional acts under a personal and advertising injury provision, but on the other hand, preclude coverage by exclusions for intent, because an irreconcilable conflict and ambiguity are created. Federal contended that Cincinnati has a duty to defend because there is a possibility of coverage under the allegations in the counterclaims. Federal noted the difference between the duty to defend and the duty to indemnify.

Cincinnati responded that insurers cannot have coverage for an expected or intended injury. Cincinnati argued that the counterclaims include clear allegations of expected and intended injuries. Cincinnati also asserted that the counterclaims' allegations included "knowing" and "willful" statutory violations. Cincinnati contended that, because the counterclaims allege intentional harm, it has no duty to defend.

Following the parties' arguments, the circuit court ruled in favor of Federal and

18

against Cincinnati. The court noted that language of intentional acts was replete throughout the counterclaims. Nevertheless, the court held that Cincinnati has a duty to defend AHMA and the executives in the underlying counterclaims because of the potential for coverage.

On December 14, 2007, the circuit court entered a written ruling on its decision to grant summary judgment in favor of Federal and against Cincinnati. In its ruling, the circuit court found: (1) Cincinnati has a duty to defend AHMA and the executives under its 2000 to 2003 and 2003 to 2006 policies with respect to the counterclaims in the underlying action; (2) the "other insurance" provisions contained in the insurers' respective policies require Cincinnati to pay one-half of all reasonable and necessary defense expenses for the counterclaims as they are incurred by AHMA and the executives going forward; (3) Federal is entitled to recover from Cincinnati one-half of the reasonable and necessary past defense costs it expended on behalf of AHMA and the executives for the counterclaims; and (4) there is no just reason for delaying either enforcement of the judgment or appeal of the order under Supreme Court Rule 304(a)(210 Ill. 2d R. 304(a))..

On January 4, 2008, Cincinnati filed a notice of appeal under number 1-08-0085, challenging the circuit court's August 10, 2006, and December 14, 2007, orders to add Federal as a third-party defendant and grant Federal summary judgment on the issue of Cincinnati's duty to defend. On March 19, 2008, the court granted Federal's motion to certify the August 10, 2006, order as final and appealable. Cincinnati then filed a second notice of appeal on April 14, 2008, under number 1-08-0995. On May 8, 2008, this court granted Cincinnati's motion to consolidate the appeals.

## II. ANALYSIS

On appeal, Cincinnati argues as a threshold issue that Federal has neither contractual nor equitable rights to pursue Cincinnati for defense fees. Cincinnati asserts that the circuit court erred by finding that Federal has standing to participate in the declaratory judgment action as a party based on the assignment agreement. Cincinnati contends that the assignment of rights from AHMA and the executives to Federal is void because it lacks consideration. Cincinnati also maintains that the assignment agreement is void because partial assignments are void absent the obligor's consent. According to Cincinnati, its anti-assignment clause prohibited AHMA's and the executives' assignment of their rights under the Cincinnati policies to Federal. Additionally, Cincinnati argues that public policy precludes the assignment agreement. Further, Cincinnati contends that the court erred by granting Federal's summary judgment motion and denying its cross-motion on the issue of duty to defend. Finally, Cincinnati asserts that Federal has no rights under the doctrine of equitable contribution to pursue Cincinnati for defense costs.

Federal responds that Cincinnati must defend AHMA and the executives because Cincinnati's policies potentially cover several offenses alleged in the counterclaims. Federal maintains that Illinois law entitles it to recover one-half of the insureds' defense costs from Cincinnati. Federal asserts that the circuit court correctly held that Cincinnati is required to reimburse Federal for one-half of the expenses it has incurred in defending AHMA and the executives and also to pay one-half of the insureds' defense expenses going forward.

### A. Standard of Review

20

The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by summary judgment. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993). Summary judgment should be granted only if the pleadings, depositions, admissions and affidavits, construed liberally and in favor of the nonmoving party, demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2006); see also *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106 (2007). Review of an order granting summary judgment is *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

Illinois courts have not addressed the standard of review for a motion to substitute parties due to a change of interest under section 2-1008(a) of the Code of Civil Procedure (735 ILCS 5/2-1008(a) (West 2006)). Illinois courts have held that when determining whether there was error in permitting a party substitution under section 2-1008(b) due to the death of a party, "the overriding consideration on appeal is whether substantial justice is being done between the litigants and whether it was reasonable, under the circumstances, to compel the other party to proceed on the merits." *Senese v. Climatemp, Inc.*, 289 Ill. App. 3d 570, 583 (1997), citing *Sickler v. National Dairy Products Corp.*, 67 Ill. 2d 229, 234 (1977). The court in *Senese* noted that, "the ultimate question on review is whether the [circuit] court properly exercised its discretion in an attempt to serve justice." 289 Ill. App. 3d at 583. Ultimately, the *Senese* court found that the language of section 2-1008(b) "uses

the permissive 'may' rather than the mandatory 'shall'; therefore, the court has discretion as to whether to dismiss the action." 289 Ill. App. 3d at 583.

In this case, section 2-1008(a) also contains permissive language, stating that "on motion an order *may* be entered that the proper parties be substituted or added, and that the cause or proceeding be carried on with the remaining parties and new parties, with or without a change in the title of the cause." (Emphasis added.) 735 ILCS 5/2-1008(a) (West 2006). Accordingly, this court likewise will review the circuit court's decision to grant Federal's motion under section 2-1008(a) for abuse of discretion "in an attempt to serve justice." *Senese*, 289 Ill. App. 3d at 583.

Finally, assignments are governed by contract law and, as such, are reviewed *de novo*. *Henderson v. Roadway Express*, 308 Ill. App. 3d 546, 548 (1999).

### B. The Validity of the Assignment Agreement

Cincinnati initially argues that the assignment agreement was invalid because (1) the agreement lacked consideration; (2) partial assignments are prohibited absent the obligor's consent; (3) Cincinnati's anti-assignment clauses in its policies prohibit assignment of AHMA's and the executives' rights to Federal; and (4) public policy precludes the assignment.

#### 1. Whether the Assignment Agreement was Supported by Consideration

Cincinnati argues that the assignment agreement lacked consideration because it contained a boilerplate recital stating that "in consideration of the foregoing and mutual promises and representations set forth below and other good and valuable consideration, the

22

adequacy of which is hereby acknowledged, AHMA, the Executives, and Federal hereby agree as follows." Cincinnati asserts that this language does not amount to proper consideration. Cincinnati also contends that Federal's agreement to pay AHMA's legal fees was not proper consideration.

Federal responds that the assignment agreement provided adequate consideration, including, a recital stating that "Federal has agreed to advance to, or on behalf of AHMA, AHMA's and the Executives' Defense Expenses subject to reservation of rights letters" and that "Federal has agreed to pay to, or on behalf of, AHMA, over $466,000 of AHMA's and the Executives' Defense Expenses in the Underlying Action." During oral argument before this court, Federal stated that it withdrew its reservation of rights as part of its consideration. In addition, Federal asserts that there was proper consideration because the assignment agreement stated that "Federal agrees to pay AHMA's and the Executives' past, present and future Defense Expenses related to the Counterclaims," and also agreed to reimburse AHMA and the executives for expenses "related to or arising out of their reasonable cooperation" with Federal in defending the counterclaims. Federal maintains that it shouldered the substantial burden of pursuing the insureds' claims on their behalf in the declaratory judgment action with a correspondingly substantial benefit to AHMA and the executives. Federal claims that, as of the date it filed its response brief, the total defense costs amount to $5.6 million. Federal notes that the boilerplate recital that Cincinnati refers to provides that the assignment agreement was made "in consideration of the foregoing," which includes the other recitals included in the agreement.

23

"An assignment occurs when 'there is a transfer of some identifiable interest from the assignor to the assignee.' " *Brandon Apparel Group v. Kirkland & Ellis*, 382 Ill. App. 3d 273, 283 (2008), quoting *Klehm v. Grecian Chalet, Ltd.*, 164 Ill. App. 3d 610, 616 (1987). " 'Generally, no particular form of assignment is required; any document which sufficiently evidences the intent of the assignor to vest ownership of the subject matter of the assignment in the assignee is sufficient to effect an assignment.' " *Brandon Apparel*, 382 Ill. App. 3d at 283, quoting *Stoller v. Exchange National Bank of Chicago*, 199 Ill. App. 3d 674, 681 (1990). A valid assignment "needs only to assign or transfer the whole or a part of some particular thing, debt, or chose in action and it must describe the subject matter of the assignment with sufficient particularity to render it capable of identification." *Klehm*, 164 Ill. App. 3d at 616. An assignment operates " 'to transfer to the assignee all the right, title or interest of the assignor in the thing assigned.' " *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 350 (2000), quoting *Litwin v. Timbercrest Estates, Inc.*, 37 Ill. App. 3d 956, 958 (1976). "A basic principle of law applicable to all assignments is that they are void unless the assignor has either actually or potentially the thing which he attempts to assign." *Owens*, 316 Ill. App. 3d at 350. An assignee "can obtain no greater right or interest than that possessed by the assignor." *Owens*, 316 Ill. App. 3d at 350. "Whether an assignment has occurred 'is dependent upon proof of intent to make an assignment and that intent must be manifested.' " *Northwest Diversified, Inc. v. Desai*, 353 Ill. App. 3d 378, 387 (2004), quoting *Strosberg v. Brauvin Realty Services, Inc.*, 295 Ill. App. 3d 17, 30 (1998). Assignments are "subject to the same requisites for validity as are other contracts, such as

24

intent, mutuality of assent, capacity to contract, legal subject matter, and consideration." *Desai*, 353 Ill. App. 3d at 387.

"Any act or promise that benefits one party or disadvantages the other is sufficient consideration to support the formation of a contract." *Kalis v. Colgate-Palmolive Co.*, 337 Ill. App. 3d 898, 900 (2003). For example, a promise to forego pursuit of a legal claim will be determined to be adequate consideration to support formation of a contract even if the claim is invalid, provided that it is asserted in good faith. *Kalis*, 337 Ill. App. 3d at 900-01.

In *F.H. Prince & Co. v. Towers Financial Corp.*, 275 Ill. App. 3d 792, 802 (1995), the court held that the release of an arguably uncollectible debt provided consideration to support a settlement agreement and highlighted an additional element of value provided by settlement of even a questionable claim. The court noted that "[s]ettlement of the [plaintiff's] litigation also relieved [defendants] of the need to continue to defend against that claim and to incur additional defense costs related thereto." *F.H. Prince*, 275 Ill. App. 3d at 802.

In *Daugherty v. Blaase*, 191 Ill. App. 3d 496, 499 (1989), the court held that "an insured may assign a cause of action to an insurance company in consideration of the insurance company's settlement before judgment of a claim against the insured." The court found that in the absence of fraud or bad faith, "a claim assigned prior to judgment constitutes a sufficient potential claim to make the assignment valid." *Daugherty*, 191 Ill. App. 3d at 499-500. Furthermore, the court noted that "permitting assignments between an insured and an insurance company both encourages the early settlement of lawsuits and

relieves our overburdened court system." *Daugherty*, 191 Ill. App. 3d at 500.

In this case, the insureds, AHMA and the executives, assigned to Federal their right to recover defense costs from Cincinnati for the underlying counterclaims. Federal is benefitted by obtaining a legal right to recover the defense expenses it has expended to date to defend its insureds in the counterclaims. AHMA and the executives likewise benefitted because they are relieved of the need to continue to defend against the counterclaims. Moreover, Federal is disadvantaged because it must continue to pay the ongoing defense costs and to reimburse AHMA and the executives for their expenses arising out of their cooperation with Federal in defending the counterclaims and Cincinnati's declaratory judgment action. As uncollectible debt has been held to be sufficient consideration in *F.H. Prince*, then for the purposes of this case, a collectible debt such as one-half of the defense expenses incurred to defend the insureds in the counterclaims likewise must serve as proper consideration for the assignment agreement. Based on the foregoing, we find that adequate consideration supports the assignment agreement. See *Kalis*, 337 Ill. App. 3d at 900-01; *F.H. Prince*, 275 Ill. App. 3d at 802.

2. Whether the Assignment Agreement is a Prohibited Partial Assignment

Cincinnati next argues that the assignment agreement is a partial assignment that is prohibited absent the obligor's consent. Essentially, Cincinnati asserts that the assignment is partial because AHMA and the executives only assigned their right to recover defense expenses, but not their rights related to indemnity.

Federal responds that Cincinnati's argument improperly conflates its separate duties

to defend and indemnify under its policies. Federal argues that, because the duties to defend and indemnify are separate, the insureds' assignment of their rights in their entirety to Federal with respect to one of these duties – the duty to defend – constitutes a complete assignment of such rights. Federal also points out that if this Court were to rule otherwise, the purpose underlying the rule against partial assignments – avoidance of multiple suits – would be frustrated.

In Illinois, "[a] partial assignment of an instrument is not binding on the obligor absent the obligor's consent." *Service Adjustment Co. v. Underwriters at Lloyd's, London*, 205 Ill. App. 3d 329, 335 (1990). Illinois courts have applied this rule to prevent the obligor from " 'be[ing] vexed twice by the same action.' " *Service Adjustment*, 205 Ill. App. 3d at 335, quoting *Bain v. Financial Security Life Insurance Co.*, 53 Ill. App. 3d 702, 706 (1977). The *Service Adjustment* court, however, noted that application of this rule "is no longer compelling because of the civil practice rules requiring joinder of necessary parties." 205 Ill. App. 3d at 335.

Based on *Service Adjustment*, Cincinnati's argument on this issue is misplaced because the rule against partial assignments refers to the division of interest in a right among multiple persons or entities, not division of the right that was assigned. In other words, if AHMA and the executives assigned their rights to recover defense costs to Federal and other persons, that would be considered a partial assignment under Illinois law. The *Service Adjustment* court's reference to the civil practice rules requiring joinder of necessary parties supports this interpretation. The bar against partial assignment appears to be logistical for

27

the purposes of fairness to multiple parties that share an interest in the thing that was assigned. *Bain* is illustrative here.

In *Bain*, the defendant, Financial Security Life Insurance Company (Financial), had purchased certain real property and improvements from Metromodular Corporation (Metromodular). Financial paid part of the purchase price in cash at closing and the balance by its interest-bearing promissory note in the principal amount of $120,000, payable to Metromodular. Thereafter, 100% of the interests in the promissory note were sold and assigned by Metromodular to the 36 plaintiffs and the individual defendant, Alva Rauch. The 36 plaintiffs were holders of 119/120th interests in the note, while Rauch held 1/120th interest. Thereafter, Metromodular filed for bankruptcy. The 36 plaintiffs, as assignees of 119/120ths of the interests in Metromodular, sued Financial on the note and named Rauch as an additional party. The circuit court granted the plaintiffs' summary judgment motion and entered judgment on the note against Financial. Damages were calculated against Financial on the basis of 119/120ths of the amount due. On appeal, Financial questioned the standing of the 36 plaintiffs to sue on partial assignments of a chose in action.

The *Bain* court's findings illustrate the proper context of a "partial assignment":

"At the time the [circuit] court entered its order for summary judgment, the plaintiff's complaint did name all of the assignees of the note and, therefore, all parties were before the trial court. We note, too, that the trial court itself could have brought the defendant Rauch into the case pursuant to Ill. Rev. Stat. ch. 110, par. 25(1)

which provides:

> 'If a complete determination of a controversy cannot be had without the presence of other parties, the court may direct them to be brought in. If a person, not a party, has an interest or title which the judgment may affect, the court, on application, shall direct him to be made a party.'

> This procedure was not herein followed and the effect of plaintiffs' act in naming Rauch a party defendant is, quite frankly, to force, at plaintiffs' unfettered discretion, the defendant Rauch and the defendant Insurance Company to either litigate a claim, which either or both of them may very well not wish to litigate, or, in the case of defendant Rauch, face the real possibility of being collaterally estopped at a later date and, in the case of defendant Insurance Company, face the real possibility of being vexed twice by the same action. This is exactly the posture in which we find this case at this time in light of the fact that the trial court did not enter any oOrder with regard to defendant Rauch, although it did find the amount due defendant Rauch on the note in question." *Bain*, 53 Ill. App. 3d at 706.

Ultimately, the *Bain* court held that in cases where in excess of 99% of the holders of an interest in an assignment involved wish to seek an adjudication of their rights, "the

29

ends of equity would not be adequately served by denying them an adjudication because the holder of 1/120th of that interest does not choose to join." Bain, 53 Ill. App. 3d at 706.

Accordingly, based on *Service Adjustment* and *Bain*, the assignment agreement in this case does not qualify as a partial assignment prohibited under Illinois law. See Service Adjustment, 205 Ill. App. 3d at 335; Bain, 53 Ill. App. 3d at 706. We find that the assignment agreement was a full assignment of interest to one assignee – Federal.

3. Whether Cincinnati's Anti-Assignment Clause Prohibits Assignment

Cincinnati next argues that its policies each contain an unambiguous anti-assignment clause that specifically states, "[y]our rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured ***." Cincinnati contends that the anti-assignment clause is enforceable here, but also concedes in its brief that "[a]nti-assignment clauses do not prohibit assignment of rights to an insurance recovery for a loss made after that loss has taken place." Cincinnati maintains that, because the counterclaims are still pending, the exception to the enforcement of anti-assignment clauses for assignments after loss is not applicable here.

Federal responds that Cincinnati cannot rely on its anti-assignment clause because it has wrongfully denied coverage to AHMA and the executives, citing *Navlyt v. State Farm Fire & Casualty Co.*, 62 Ill. App. 3d 387, 392 (1978). Federal argues that Cincinnati cannot disclaim all obligations under its policies and simultaneously insist that the insureds obtain its consent to transfer rights that Cincinnati contends do not exist. In addition, Federal asserts that the exception to the enforcement of anti-assignment clauses for assignments after

30

loss is applicable here because the claim arose after the counterclaims were filed. According to Federal, the defense costs arose when the allegations contained in the counterclaims triggered a duty to defend.

In *Young v. Chicago Federal Savings & Loan Ass'n*, 180 Ill. App. 3d 280 (1989), the defendant, Chicago Federal Savings & Loan Association (Chicago Federal), received a mortgage from a nonparty to secure a note for $21,500. Thereafter, the title company issued its loan policy insuring the mortgage. During the term of the policy, the real estate taxes on the mortgaged property became delinquent. The taxes were paid by a third party who eventually acquired a tax deed for the property, which extinguished Chicago Federal's mortgage interest. Once Chicago Federal discovered that the third party had been granted a tax deed for the property, it informed the title company, which denied coverage under its policy because it did not cover liens attaching after the date of the policy. Chicago Federal then assigned the mortgage to the plaintiff, who paid $5,000 in consideration. After the assignment, the title company contacted Chicago Federal and stated that it would reimburse Chicago Federal in the amount of $14,362.86 in order to maintain a sound business relationship. The plaintiff filed a lawsuit to recover these proceeds. The circuit court granted summary judgment in favor of the plaintiff and entered judgment in her favor for $14,362.86.

On appeal, Chicago Federal argued that its assignment to the plaintiff was invalid because the title company did not consent to the assignment. The *Young* court affirmed the circuit court's decision. The court held that, when Chicago Federal assigned its policy to the plaintiff while its claim was still pending before the title company, "it assigned its right to

the policy proceeds, a chose in action." *Young*, 180 Ill. App. 3d at 285. The court stated, "[a]n insurance policy that is assigned after a claim arises is an assignment of the policy proceeds; such a transaction results in assignment of a chose in action which does not require the insurer's consent." *Young*, 180 Ill. App. 3d at 285.

The court also referred to Couch on Insurance in support of its holding:

> " '[T]he great weight of authority supports the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply to assignments before loss only, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim.' " *Young*, 180 Ill. App. 3d at 285, quoting 16 Couch on Insurance §63:40, at 763-65 (2d rev. ed. 1983).

Pertinent here, the Ohio Supreme Court further elaborated on this issue:

> "The negation of the anti-assignment clause does not produce an unjust result for the insurer. The idea that an insurer would have to defend both the transferor and the transferee for the same risk is not sound. If the right to a defense has been transferred to a successor,

the transferor no longer has that right. The right cannot both be transferred and retained." *Pilkington North America, Inc. v. Travelers Casualty & Surety Co.*, 112 Ohio St. 3d 482, 496; 861 N.E.2d 121, 143 (2006).

In this case, as Cincinnati correctly points out, the counterclaims are still pending. AHMA and the executives assigned to Federal their rights to the policy proceeds, namely, the defense costs, after the counterclaims were filed. The assignment was the transfer of a right to a "money claim" asserted after the loss has taken place because the defense costs can be defined and are not contingent, even though the amount of defense costs continues to grow. As in *Young*, this transaction resulted in the assignment of a chose in action, which does not require Cincinnati's consent. 1 Young, 80 Ill. App. 3d at 285. Therefore, we find that Cincinnati's anti-assignment clause did not prohibit the assignment agreement. See *Young*, 180 Ill. App. 3d at 285.

4. Whether the Assignment Agreement Violates Public Policy

Cincinnati next contends that the assignment agreement violates public policy because it allows "an impermissible intrusion by a stranger into the attorney-client relationship." Cincinnati relies upon *Clement v. Prestwich*, 114 Ill. App. 3d 479 (1983), in support of its argument. Cincinnati asserts that the holding in *Clement* is applicable because AHMA and the executives assigned to Federal their rights against Cincinnati with regard to Cincinnati's duty to provide a legal defense for the counterclaims.

Federal responds that Cincinnati's argument is without merit because it fails to cite any authority precluding an assignment agreement such as the one in this case. Federal argues that

*Clement* is inapplicable because the assignment in that case involved a legal malpractice claim. Federal asserts that an insurer's contractual obligation to defend its insured is not analogous to or equivalent with an attorney's fiduciary duties to his client, citing *Nielsen v. United Services Automobile Ass'n*, 244 Ill. App. 3d 658 (1993).

"In Illinois, there is no fiduciary relationship between an insurance company and an insured." *Nielsen*, 244 Ill. App. 3d at 666. Here, the assignment involved recovery of defense costs arising from an insurer's duty to defend and not a legal malpractice claim as in *Clement*.

A client's claim for legal malpractice arises from a personal relationship between client and attorney and involves a claim that the attorney has breached a personal duty to the client. See *Clement*, 114 Ill. App. 3d at 480. In holding that assignment of legal malpractice claims violate public policy, the *Clement* court reasoned:

> " 'It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. *** The endless

34

complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.' " 114 Ill. App. 3d at 481, quoting *Goodley v. Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397, 133 Cal. Rptr. 83, 87 (1976).

The public policy concerns raised by the assignment of legal malpractice claims do not arise under the circumstances of this case. The record supports that Federal is not attempting to intrude into any attorney-client relationship, rather, it seeks reimbursement of defense expenses it incurred while defending mutual insureds under both the Cincinnati and Federal insurance policies. Therefore, *Clement* is inapplicable. We find that the assignment agreement in this case raises no public policy concerns. See *Nielsen*, 244 Ill. App. 3d at 666.

### C. The Duty to Defend

Cincinnati next argues that the circuit court erred by finding that it has a duty to defend AHMA and the executives in the underlying counterclaims. Cincinnati asserts that the duty to defend has not been triggered because there is no potential for coverage. Cincinnati maintains that the counterclaims allege non-fortuitous loss, which are not covered under its policies. In addition, Cincinnati contends that Federal has not established that Cincinnati has a duty to defend.

Federal responds that the counterclaims allege several offenses potentially covered under

Cincinnati's policies, thereby triggering Cincinnati's duty to defend. Federal argues that Cincinnati cannot conclusively eliminate any potential coverage by application of express or purportedly implicit policy exclusions. Federal asserts that Cincinnati's attempts to negate the duty to indemnify cannot be used to avoid its duty to defend.

An insurer's duty to defend is determined by comparing the allegations in the underlying complaint to the relevant provisions of the insurance policy. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 107-08 (1992). The threshold for pleading a duty to defend is minimal. *Management Support Associates v. Union Indemnity Insurance Co. of New York*, 129 Ill. App. 3d 1089, 1096 (1984). If an underlying complaint alleges facts within or potentially within coverage, the insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent. *Hartford Fire Insurance Co. v. Whitehall Convalescent & Nursing Home, Inc.*, 321 Ill. App. 3d 879, 888 (2001). This court recently held that consideration of a third-party complaint in determining a duty to defend is in line with the general rule that a circuit court may consider evidence beyond the underlying complaint if in doing so, the circuit court does not determine an issue critical to the underlying action. *American Economy Insurance Co. v. Holabird & Root*, 382 Ill. App. 3d 1017, 1031-32 (2008). The insurer justifiably refuses to defend the insured if it is clear from the face of the underlying complaint that the allegations fail to state facts which bring the cause within or potentially within coverage. *Dixon Distributing Co. v. Hanover Insurance Co.*, 161 Ill. 2d 433, 439 (1994); *Outboard Marine*, 154 Ill. 2d at 125. If several theories of recovery are alleged in the underlying complaint against the insured, the insurer's duty to defend arises even if only one of several theories is within the potential coverage of the policy. *Hartford Fire Insurance*, 321 Ill. App.

36

3d at 888, citing *Bituminous Casualty Corp. v. Fulkerson*, 212 Ill. App. 3d 556, 564 (1991). "Furthermore, if the insurer relies on an exclusionary provision, it must be clear and free from doubt that the policy's exclusion prevents coverage." *Hartford Fire Insurance*, 321 Ill. App. 3d at 888.

## 1. Whether the Fortuity Doctrine is Applicable

Cincinnati contends that the defamation and libel counts alleged in the counterclaims do not allege any fortuitous loss and, therefore, no duty to defend was triggered. Cincinnati asserts that its 2003 to 2006 policy does not cover a lawsuit that alleges non-fortuitous loss. Relying on *Board of Education of Maine Township High School District 207 v. International Insurance Co.*, 292 Ill. App. 3d 14 (1997), and *Viking Construction Management, Inc. v. Liberty Mutual Insurance Co.*, 358 Ill. App. 3d 34 (2005), Cincinnati argues that all insurance is subject to the limitation that it is only applicable to fortuitous loss. In addition, Cincinnati maintains that it has no duty to defend intentional torts such as defamation and libel.

Federal responds that Cincinnati has conflated intentional acts with intentionally caused injuries. Federal argues that the assertion of intentional acts does not run afoul of the fortuity requirement. Federal notes that none of the cases cited by Cincinnati involve the personal and advertising injury coverage at issue here. Federal asserts that, to expressly grant coverage for intrinsically intentional conduct and at the same time disclaim a duty to defend because the underlying allegations assert intentional conduct suggests that the Cincinnati policies either provide virtually non-existent coverage or contain a fatal ambiguity. Federal contends that, if Cincinnati's reasoning is correct – that personal and advertising injury coverage does not apply to the intentional acts of the insured – the coverage would be illusory.

"Fortuitous" means happening by chance or accident, or occurring unexpectedly or without known cause. *Johnson Press of America, Inc. v. Northern Insurance Co. of New York*, 339 Ill. App. 3d 864, 872 (2003). The Restatement of Contracts defines a fortuitous event as one that, as far as the parties are aware, is dependent on chance. *Johnson Press*, 339 Ill. App. 3d at 872, citing Restatement of Contracts §291, Comment a, 430-31 (1932). "The determination of whether a loss is fortuitous is a legal question for the court to determine." *Johnson Press*, 339 Ill. App. 3d at 872.

Illinois courts consider that defamation is now generally governed by two standards of fault and proof – negligence and actual malice. See *St. Paul Insurance Co. of Illinois v. Landau, Omahana & Kopka, Ltd.*, 246 Ill. App. 3d 852, 858 (1993). Actual malice need not be equated with an intention to do an act from which injury may be expected. *St. Paul*, 246 Ill. App. 3d at 858. Significantly for the purposes of this case, the *St. Paul* court held that "[a]llegations of recklessness may bring a defamation claim within the potential coverage of a policy which covers defamation but excludes knowing falsehoods." 246 Ill. App. 3d at 859.

Initially, it should be noted that Cincinnati's reliance upon *Board of Education* and *Viking Construction* is misplaced. Contrary to Cincinnati's argument, *Board of Education* does not hold that all insurance is subject to the limitation that it is only applicable to fortuitous losses. The pertinent portion of that case refers to "all risk" policies: " 'Generally, an "all risk" insurance policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an "all risk" policy will, as a rule, be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.' [Citation.]" *Board of Education*, 292 Ill. App. 3d at 17. The *Board of*

38

*Education* case involves latent defect claims for asbestos-related property damage, which are not at issue here.

Furthermore, Cincinnati improperly contends that *Viking Construction* stands for the proposition that coverage provided for fortuitous losses is a "requirement implicit in every liability insurance policy." The pertinent portion of *Viking Construction* discusses three approaches in its analysis of whether faulty construction is covered under a CGL policy. The *Viking Construction* court lists the three approaches, the second of which concerns "application of the 'business risk,' 'ordinary and natural consequences,' or 'breach of contract doctrine.'" *Viking Construction*, 358 Ill. App. 3d at 43, quoting W. Lyman, *Is Defective Construction Covered Under Contractors' and Subcontractors' Commercial General Liability Insurance Policies?*, Practising Law Institute, Real Estate Law and Practice Course Handbook Series, 491 PLI/Real 505, 513 (April 2003). The *Viking Construction* court then states, "[t]he rationale for the second approach is 'the requirement implicit in every liability insurance policy-specifically, that coverage is provided only for fortuitous losses.'" 358 Ill. App. 3d at 43, quoting J. Yang, *No Accident: The Scope of Coverage for Construction Defect Claims*, 690 Practising Law Institute, Litigation and Administrative Practice Course Handbook Series 7, 25 (April 2003). In short, *Viking Construction*, like *Board of Education*, is a faulty construction case and is inapplicable here.

Cincinnati has not cited to any cases involving the fortuitous doctrine based on the allegations contained in the underlying counterclaim. Based on the holding in *St. Paul*, the fortuity doctrine does not apply in this case. See *St. Paul*, 246 Ill. App. 3d at 858-59. Nevertheless, an issue remains regarding whether Cincinnati has a duty to defend claims that the insureds intended, or

expected, to cause the alleged harm in question.

### 2. Whether the Duty to Defend was Triggered

In this case, the counterclaims assert, *inter alia*, causes of action for defamation and libel against AHMA and the executives. As previously discussed, the *St. Paul* court held that a defamation complaint set forth allegations which were within or potentially within coverage and, as such, the insurer was required to defend the action. *St. Paul*, 246 Ill. App. 3d at 859. In addition to the holding in *St. Paul*, two notable decisions from federal courts, applying Illinois law, are pertinent here.

In *Tews Funeral Home, Inc. v. Ohio Casualty Insurance Co.*, 832 F.2d 1037, 1045 (7th Cir. 1987), the defendant, Ohio Casualty Insurance Company (Ohio Casualty), issued a comprehensive general liability policy to the plaintiff, Tews Funeral Home (Tews). Within the policy period, Tews was named as a defendant in a case alleging that it conspired with other funeral homes in an attempt to maintain artificially high prices for their burial services and products. In addition, Tews was accused of conspiring to make false, misleading and defamatory statements disparaging the underlying plaintiff and violating the Uniform Deceptive Trade Practices Act.

Ohio Casualty hired an attorney to represent Tews and conducted the defense under a reservation of rights. Tews retained independent counsel, who requested an acknowledgment from Ohio Casualty that it had a duty to pay the fees and costs of independent counsel in defending the suit. Ohio Casualty refused this demand. Tews then filed a declaratory judgment action regarding its rights and Ohio's duties. Tews alleged that, regardless of whether Ohio Casualty had a duty to indemnify Tews for any damages that might arise from the underlying lawsuit, Ohio Casualty had

40

a duty to defend Tews because the claims were potentially within the scope of coverage under Ohio Casualty's policy.

Ohio Casualty argued that its policy explicitly excluded coverage for intentional acts. The United States Court of Appeals, Seventh Circuit, held that Ohio Casualty's policy was, at best, ambiguous. The court noted that an "advertising offense" was defined in the policy to include "many torts that characteristically require intent, maliciousness or willfulness, such as libel, slander, defamation or the various forms of unfair competition." *Tews*, 832 F.2d at 1045. The court stated that an ambiguity arose in the policy's definition of "occurrence," which stated that only unintentional acts from the standpoint of the insured are covered. The *Tews* court pointed out that, in effect, one part of the policy insured against intentional torts or acts, while another part of the policy attempted to exclude coverage for those same acts. The *Tews* court resolved this ambiguity against Ohio Casualty and held that Ohio Casualty was required to defend Tews in the underlying complaint because the policy potentially covered the conduct alleged there. 832 F.2d at 1045. In addition, the *Tews* court found that claims for violations of the Uniform Deceptive Trade Practices Act and Illinois Consumer Fraud Act were sufficient to state a cause of action for libel, which potentially was covered under Ohio Casualty's policy. 832 F.2d at 1044.

Another Seventh Circuit case, *Hurst-Rosche Engineers, Inc. v. Commercial Union Insurance Co.*, 51 F.3d 1336 (7th Cir. 1995), involved a Cincinnati insurance policy and the same argument Cincinnati makes here. The plaintiff, Hurst-Rosche Engineers, Inc. (Hurst-Rosche), was Cincinnati's policyholder. Cincinnati had issued to Hurst-Rosche an umbrella commercial liability policy that expressly covered defamation claims. In the underlying action, a granite company sued Hurst-

41

Rosche for libel and tortuous interference with contract. Cincinnati informed Hurst-Rosche that it would not provide a defense to the underlying suit because the duty to defend belonged to the primary carrier. After Hurst-Rosche was found liable for damages in the underlying case, it filed an action against Cincinnati seeking damages, recovery of attorneys' fees and declaratory relief for breach of contract and vexatious refusal to pay insurance benefits. The district court granted summary judgment in favor of Cincinnati.

The Seventh Circuit noted that the Cincinnati policy defined covered personal injury claims to include claims for, *inter alia*, libel, slander and defamation of character, and that these torts, by definition, require proof of intent or willfulness. The court also noted that, despite the apparent coverage for the specified intentional torts, the Cincinnati policy's definition of an "occurrence" limited coverage only to those claims resulting from unintentional conduct. The Seventh Circuit found that these definitions created an internal inconsistency because, "on the one hand Cincinnati purports to provide coverage for intentional tort claims, and on the other hand Cincinnati denies coverage for those same claims." *Hurst-Rosche*, 51 F.3d at 1345. The court further found that the Cincinnati policy's definitions were similar to those provisions in *Tews*. The court held that the ambiguity in the Cincinnati policy must be resolved in favor of the insured. *Hurst-Rosche*, 51 F.3d at 1346. The Cincinnati policy's "occurrence" language did not preclude coverage for the underlying action's claims for libel with malice and tortious interference with contract.

On October 7, 2008, we granted Cincinnati's motion to cite additional authority, which included a recent decision from the United States District Court, Central District of Illinois, entitled, *Cincinnati Insurance Co. v. Shanahan*, No.07-3164 (C.D. Ill. Sept. 26, 2008). In *Shanahan*, each

count of the underlying defamation complaint alleged intentional conduct. The *Shanahan* court, in contrast to *Tews* and *Hurst-Rosche*, found no internal inconsistencies in the pertinent Cincinnati policies because (1) the injury as alleged was not caused by an "occurrence," and (2) the underlying complaint only alleged intentional conduct. The *Shanahan* court held that the insured was not entitled to coverage for the allegations contained in the underlying complaint. In addition, Cincinnati, citing *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 761 (2005), asserts that the duty to defend is dependent upon conduct actually plead in the complaint and not a hypothetical version, and that in this case, the conduct plead only involved intentional acts.

The reasoning in *Hurst-Rosche*, rather than *Shanahan* and *Caremark*, is on point for the instant case. Here, unlike *Shanahan* and *Caremark*, the Cincinnati policies' definition of occurrence is broader and the underlying complaint included allegations of both negligent and intentional conduct.

The injuries alleged in the underlying counterclaims occurred between July 2003 and April 2004, which potentially triggered both Cincinnati's 2000 to 2003 and 2003 to 2006 policies. The counterclaims' defamation and libel counts were not limited to allegations of intentional conduct, but also claimed that AHMA and Timothy Farrell "exhibited a reckless disregard for the falsity of these statements." The 2000 to 2003 policy provided coverage for personal and advertising injuries including "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." The 2003 to 2006 personal and advertising injury liability coverage defined covered claims for injury arising out of "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization." The

exclusions in both policies excluded coverage for "knowing violation of rights of another" and "material published with knowledge of falsity." In addition, the Cincinnati policies' definition of "occurrence" limited coverage only to those claims resulting from unintentional conduct.

In short, the Cincinnati policies purport to provide coverage for defamation and libel, but the 2003 to 2006 policy and the definition of "occurrence" provide coverage only for unintentional conduct. Accordingly, as in *Hurst-Rosche*, the Cincinnati policies contain internal inconsistencies because, "on the one hand Cincinnati purports to provide coverage for intentional tort claims, and on the other hand Cincinnati denies coverage for those same claims." *Hurst-Rosche*, 51 F.3d at 1345. Based on the well-reasoned decisions in *Tews* and *Hurst-Rosche*, we find that the ambiguity in the Cincinnati policies must be resolved in favor of the insureds or, in this case, the assignee of the insureds, Federal. Furthermore, as in *Hurst-Rosche*, we find the Cincinnati policies' "occurrence" language did not preclude coverage for the underlying counterclaims for defamation and libel. 51 F.3d at 1346.

The allegations in the underlying counterclaims also are of key importance to our analysis because the duty to defend is determined by comparing the allegations in the underlying complaint to the relevant provisions of the insurance policy. *Outboard Marine*, 154 Ill. 2d at 107-08. Significantly, alleged deliberate misconduct does not always bring a claim within an intentional conduct exclusion:

> "[I]t is important to this case that the exclusion is not of
> intentional torts as such (nor is defamation an intentional tort in any
> simple sense), but of tortious conduct in which there is an intent to

injure or an expectation of injuring. And in the case of defamation, at least, the exclusion does not track the tort. *** [D]efamation is often not intended or expected to injure anyone." *Cincinnati Insurance Co. v. Eastern Atlantic Insurance Co.*, 260 F.3d 742, 746 (7th Cir. 2001).

In other words, an intent to injure or expectation of injury is not an element of the tort of defamation. *Eastern Atlantic*, 260 F.3d at 746-47. For the purposes of this case, the underlying counterclaims alleged reckless conduct that "may bring a defamation claim within the potential coverage of a policy which covers defamation but excludes knowing falsehoods." *St. Paul*, 246 Ill. App. 3d at 859.

In sum, we find that Cincinnati's duty to defend was triggered because the underlying counterclaims' defamation claims fall within the terms of Cincinnati's policies. *St. Paul*, 246 Ill. App. 3d at 859. Although the threshold for pleading a duty to defend is minimal (*Management Support*, 129 Ill. App. 3d at 1096), Cincinnati's duty to defend, at a minimum, is clear from the face of the alleged defamation claims asserted in the counterclaims. Therefore, Cincinnati cannot justifiably refuse to defend its insureds. *Dixon Distributing*, 161 Ill. 2d at 439; *Outboard Marine*, 154 Ill. 2d at 125. Accordingly, Cincinnati has a duty to defend AHMA and the executives in the underlying counterclaims. Consequently, Cincinnati also is obligated to reimburse Federal one-half of the defense expenses incurred to date in the defense of the underlying counterclaims and to pay Federal one-half of the defense expenses going forward. Based upon this ruling, we need not address whether the duty to defend was triggered from the remainder of the counterclaims because the insurer's duty to defend arises even if only one of several theories is within the potential coverage of the policy. *Hartford Fire Insurance*, 321 Ill. App. 3d at 888, citing *Bituminous Casualty Corp.*,

45

212 Ill. App. 3d at 564.

### D. The Doctrine of Equitable Contribution

Finally, Cincinnati asserts that Federal has no right under the doctrine of equitable contribution to pursue Cincinnati for defense costs because the subject policies do not insure the same risk. Cincinnati asserts that its policies provide commercial general liability on an occurrence basis, while the Federal policy provides coverage under a claims-made, not-for-profit liability policy and that the terms within these policies have different meanings.

Federal responds that it possesses a right of equitable contribution from Cincinnati for Cincinnati's share of the defense expenses incurred in defending the counterclaims. Federal asserts that the substantial overlap of the risks encompassed by the offenses defined in the respective policies asserted in the counterclaims establish that Federal and Cincinnati are co-primary insurers of AHMA and the executives.

"The doctrine of equitable contribution permits an insurer that has paid the entire loss to be reimbursed by other insurers that are also liable for the loss." *Liberty Mutual Insurance Co. v. Westfield Insurance Co.*, 301 Ill. App. 3d 49, 52 (1998). The doctrine of equitable contribution "arises from a right which is independent from the rights of the insured, to recover from a co-obligor who shares the same liability as the party seeking contribution." *Argonaut Insurance Co. v. Safway Steel Products, Inc.*, 355 Ill. App. 3d 1, 10-11 (2004). This doctrine may arise where the insurance policies at issue "cover a risk on the same basis and there is an identity between the policies as to parties and insurable interests and risks." *Home Indemnity Co. v. General Accident Insurance Co. of America*, 213 Ill. App. 3d 319, 321 (1991). The court in *Schal Bovis, Inc. v. Casualty Insurance*

46

*Co.*, 315 Ill. App. 3d 353, 363 (2000) further elaborated upon the requirement that there be an identity of parties, insurable interests and risks:

> " 'It is not necessary that the policies provide identical coverage in all respects in order for the two policies to be considered concurrent, and each insurer entitled to contribution from the other; as long as the particular risk actually involved in the case is covered by both policies, the coverage is duplicate, and contribution will be allowed.' " 315 Ill. App. 3d at 363, quoting 15 L. Russ & P. Segella, Couch on Insurance §218:16, at 218-1 (3d ed. 1999).

The holding in *Schal Bovis* was cited with approval by our supreme court in *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 318-322 (2004).

Equitable contribution does not apply to primary/excess insurance issues because by they cover different risk by their very definitions. *Home Insurance Co.*, 213 Ill. App. 3d at 321. Accordingly, the key question here is whether the policies establish a sufficient commonality of risks to support an equitable contribution claim.

In this case, the record shows, and the parties do not dispute, that the policies at issue all afford primary coverage to the same insureds. Cincinnati's argument that the policies insure different risks because they are either occurrence-based or claims-made is unavailing because whether a policy is occurrence-based or claims-made refers to how the policy is triggered rather than the type of risk it insures. Here, the respective insurance policies each cover the same risks as sought in the counterclaims, *inter alia*, defamation, libel and trademark infringement. Cincinnati's policies

47

insure against injury arising out of the oral or written publication of material that slanders or libels a person or organization. Federal's policy includes coverage for injuries arising out of "a Wrongful Act," including, for example, defamation and trademark infringement.

Further, the "other insurance" provisions in each of the subject policies reinforce the conclusion that Cincinnati and Federal provide coverage on the same basis. Notably, Cincinnati's policies state that, "[i]f all of the other insurance permits contribution by equal shares, we will follow this method also." Federal's "other insurance" provision states, "[i]f Loss arising from a Claim made against any Insured is insured under any other valid policy, prior or current, then this policy shall cover such Loss *** only to the extent that the amount of such Loss is in excess of the amount of payment from such other insurance," whether primary or excess.

In sum, the record shows that each of the respective policies share significant, fundamental commonalities of risk that support a finding that the equitable contribution doctrine is applicable in this case. Accordingly, we find that the circuit court correctly held that Cincinnati must reimburse Federal for one-half of the defense expenses it has incurred to date in defending AHMA and the executives and also pay Federal one-half of the insureds' defense expenses going forward.

### III. CONCLUSION

In conclusion, we find that the circuit court of Cook County properly granted Federal's motion for addition of parties under section 2-1008 of the Code of Civil Procedure (735 ILCS 5/2-1008 (West 2006)). In addition, we find that the circuit court properly granted summary judgment in favor of Federal and against Cincinnati on the issue of duty to defend AHMA and the executives under its 2000 to 2003 and 2003 to 2006 policies with respect to the counterclaims in the underlying

action. Furthermore, we affirm the circuit court's ruling that the "other insurance" provisions contained in the insurers' respective policies require Cincinnati to pay one-half of all reasonable and necessary defense expenses for the counterclaims as they are incurred by AHMA and the executives going forward. Finally, as a matter of equitable contribution, we find that Federal is entitled to recover from Cincinnati one-half of the reasonable and necessary past defense costs it expended on behalf of AHMA and the executives for the counterclaims.

Affirmed.

GREIMAN and THEIS, JJ., concur.